In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-2272, 07-3893, 07-3940, 07-4010 & 08-3265

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TROY MARTIN, EDDIE BELL,
JOHN BRAYBOY, MARIO TAYLOR
and JEROME TERRELL,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:04-cr-495—**Rebecca R. Pallmeyer,** *Judge.*

ARGUED OCTOBER 7, 2009—DECIDED AUGUST 24, 2010

Before RIPPLE, KANNE and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The defendants have been convicted of violating various provisions of 21 U.S.C. §§ 841, 843 and 846, for their respective roles in a narcotics con-

spiracy.[1] They have timely appealed their convictions on various grounds.[2] For the reasons set forth in this opinion, we affirm the judgment of the district court. However, for certain defendants, we order limited remands for resentencing.

## I

## BACKGROUND

On September 7, 2004, a grand jury indicted the defendants and many other individuals for various narcotics and firearm offenses. The indictment described the defendants' participation in a sprawling narcotics-distribution network on the west side of Chicago, Illinois, that had been in existence since 1998. A large part of the network consisted of a street gang called the "Mafia Insane Vice Lords" or the "Mafia Insanes." That gang was organized hierarchically and employed violence to control "drug spots" where narcotics were sold. Individual sellers paid a fee to the gang's leadership (a "street tax") in return for supply of narcotics, protection and the ability to sell at the drug spots. Troy Martin was the founder and "king" of the Mafia Insanes. Eddie Bell and Donnell Simmons were high-ranking members of the Mafia Insanes' leadership who supplied narcotics to the

---

[1] The jurisdiction of the district court is based on 18 U.S.C. § 3231.

[2] The jurisdiction of this court is based on 28 U.S.C. § 1291.

sellers and collected street taxes from the drug spots.[3] Jerome Terrell was a member of another gang called the "Cicero Insane Vice Lords" and also supplied narcotics to Mr. Simmons. Mario Taylor was a member of another street gang called the "Four Corner Hustler" gang; Mr. Taylor coordinated the supply of narcotics to Mr. Simmons and Mr. Terrell. John Braboy assisted Mr. Taylor with packaging and transporting narcotics to Mr. Simmons.[4]

---

[3] Donnell Simmons's appeal has been severed from this consolidated appeal. References to Mr. Simmons in this opinion are for contextual purposes only.

[4] The indictment charged Messrs. Martin, Bell, Simmons, Taylor, Braboy and Terrell with conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846 ("Count One"). Mr. Martin also was charged with eighteen counts of using a telephone to facilitate a narcotics conspiracy in violation of 21 U.S.C. § 843(b). Mr. Bell was charged with one count of distributing heroin in violation of 21 U.S.C. § 841(a)(1) and four telephone counts in violation of § 843(b). (The Government eventually dismissed the distribution count against Mr. Bell.) Mr. Simmons was charged with two distribution counts in violation of § 841(a)(1). Mr. Taylor was charged with five telephone counts in violation of § 843(b) and five possession counts in violation of § 841(a)(1). Mr. Braboy was charged with two possession counts in violation of § 841(a)(1). (We note that the indictment and the caption of this appeal refer to Mr. Braboy as "Brayboy." However, in his appellate brief, he informs us that the proper spelling of his name is "Braboy." *See* Braboy Appellant's Br. 2 n.3. Accordingly, we shall refer to him

(continued...)

Many of the defendants pleaded guilty. The remaining defendants proceeded to trial. In August 2006, Messrs. Martin, Bell and two others were tried and convicted. In April 2007, Messrs. Taylor and Braboy were tried and convicted. In July 2007, Mr. Terrell was tried alone and convicted. At each trial, the Government's evidence consisted primarily of wiretap recordings that the Government had obtained during its investigation into the conspiracy, as well as the testimony of police officers, federal agents and cooperating witnesses. Additional facts shall be provided on an issue-by-issue basis.

## II

## ANALYSIS

### A.  Challenge to the Admissibility of the Wiretap Recordings

#### 1.

In December 2002, the Government began utilizing the procedures described in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. §§ 2510-22, for intercepting wire communications of suspected members of the conspiracy. Several suspects' phones were targeted during the Government's investigation. We are concerned primarily with the Govern-

---

[4]  (...continued)
as "Braboy" in this opinion.) Mr. Terrell was charged with two distribution/possession counts in violation of § 841(a)(1) and three telephone counts in violation of § 843(b).

ment's wiretaps on the phones of Messrs. Martin and Simmons.

Each time the Government desired to intercept communications on a particular phone, it sought authorization from the Chief Judge of the United States District Court for the Northern District of Illinois. Included with the Government's wiretap applications were probable cause affidavits that identified the phone to be targeted and a description of the subject matter of the communication that the Government expected to intercept. The affidavits also described the bases for the Government's belief that criminal matters would be discussed. The Chief Judge issued orders authorizing the interception of communications on the phones for thirty days at a time. If the Government desired to continue a phone intercept for longer than thirty days, the Government would submit to the Chief Judge a renewal application, including updated probable cause affidavits.

The Government recorded the wiretap intercepts on magneto-optical ("MO") disks. MO disks cannot be edited. At the completion of each thirty-day intercept period for a particular phone, irrespective of whether the Government had obtained an extension to continue its wiretap on that phone, the Government sealed, in the Chief Judge's presence, the original MO disks.[5] The Government kept the sealed MO discs in a DEA evidence

---

[5] As explained more fully below, the relevant statute in this appeal, 18 U.S.C. § 2518(8)(a), requires the Government to seal wiretap intercepts at the completion of each authorized intercept period.

vault. The Government made duplicate recordings of each MO disc for its own use in its pending investigation. Also, police officers created, in real time, line-sheets describing the substance of the intercepted communications. These line-sheets were disseminated to officers and used extensively in the Government's pending investigation.

The Government employed these procedures for wire communications on the suspects' phones from approximately December 2002 until October 2003. With respect to the phones relevant on this appeal, the Chief Judge authorized the Government to wiretap Messrs. Martin's and Simmons's phones for the following periods: Mr. Martin's target phone 2 from February 2003 to September 9, 2003, and Mr. Simmons's target phone 4 from August 2003 to September 17, 2003. *See* Tr. at 55-58, 61-62, Mar. 3, 2006.

In October 2003, the Government's investigation was nearing an end, and the Government planned to arrest many of the suspects. The Government intended to play the wiretap recordings for the arrestees to facilitate the interrogations. However, on October 10, 2003, the Government discovered that some of its working copies of the communications on Messrs. Martin's and Simmons's phones were incomplete. On the same day, the Government informed the Chief Judge and sought permission to unseal the MO disks that had been stored in the DEA vault. On October 14, 2003, the first business day after the Columbus Day holiday, the court authorized unsealing. On that same day, the

Government unsealed the recordings in its vault and discovered that portions of certain sealed MO discs were blank (hereinafter referred to as "the blank-sealed recordings").[6] Later, that same day, after receiving the Chief Judge's permission to do so, the Government sealed reconstituted MO discs of the blank-sealed recordings, which the Government had created by duplicating its working copies; however, certain working copies of the blank-sealed recordings had been lost and, for those portions of intercepted communications, no reconstituted MO discs could be sealed.[7]

---

[6] Specifically, (1) the MO disc purportedly containing recordings of Mr. Martin's target phone 2 during the period April 16 to May 15, 2003, contained no recordings; (2) the disc purportedly containing recordings of Mr. Martin's target phone 2 during the period June 13 to July 11, 2003, contained no recordings for the period June 13 to July 8; and (3) the disc purportedly containing recordings of Mr. Simmons's target phone 4 during the period August 19 to September 12, 2003, contained no recordings of calls between September 9 and September 12, and did not include recordings of any calls made over the "push-to-talk" feature of the phone. *See* Appellee's Br. 16-17; R.882 at 4-5; *see also infra* note 17.

[7] Specifically, on October 14, 2003, the Government sealed duplicate recordings of the calls on Mr. Martin's target phone 2 for the period June 13 to July 8, and duplicate recordings of the calls on Mr. Simmons's target phone 4 for the period September 9 to September 12. However, the Government was unable to reconstitute the recordings on Mr. Martin's target phone 2

(continued...)

The takedown was delayed because of the problem with the tapes; the Government continued its investigation without using the blank-sealed recordings. For instance, the Government developed probable cause applications for wiretaps on additional suspects' phones without reference to the contents of the blank-sealed recordings. According to one Government agent, the Government essentially "set [the blank-sealed recordings] aside and decided not to use them in any further enforcement action or investigation." Tr. at 61, Mar. 3, 2006. Eventually the takedown occurred, and Mr. Martin was arrested.

**2.**

During pretrial proceedings, Mr. Martin filed a motion to suppress, contending that the Government had violated the immediate sealing requirement of 18 U.S.C. § 2518(8)(a).[8] R.626 at 1. In his view, the statute

---

[7] (...continued)

for the period April 16 to May 15, or recordings of the push-to-talk calls on Mr. Simmons's target phone 4 for the period August 19 to September 12. Instead, on October 17, 2003, the Government sealed copies of its line-sheets for those periods. *See* Martin/Bell Appellants' Br. 16-17; R.882 at 4-5.

[8] That statutory provision reads:

The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or

(continued...)

had been violated because the reconstituted copies had not been sealed immediately after the conclusion of the wiretaps. He requested an evidentiary hearing "to determine whether evidence resulting from the illegally intercepted conversations should be suppressed." *Id.* at 2.

The Government opposed the motion and Mr. Martin's request for a hearing. R.882. The Government conceded that it had sealed MO discs that it believed to have con-

---

[8] (...continued)

other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518(8)(a).

tained recordings, but which were actually blank or partially blank. *Id.* at 1. However, the Government volunteered not to use any of the blank-sealed recordings as evidence at trial. *Id.* at 7. With respect to evidence derived from those recordings, the Government contended that the derivative evidence should be admissible for two reasons. First, the Government contended that, even though it would not use the blank-sealed recordings at trial, they were admissible in any event because the Government had a "satisfactory explanation" for the non-sealing: "DEA technician error." *Id.* at 9-10.[9]

_____

[9] The Government included an affidavit from Victor Jasevicius, Group Supervisor for the DEA Technical Operations Group that conducted the wiretaps, which stated,

> After the DEA learned in mid-October 2003 that some previously-sealed MO discs did not contain any or complete call data for certain wiretap interception periods, DEA conducted an investigation into the particular reason why the equipment used to intercept and record communications would produce a blank or incomplete MO disc. DEA concluded that a number of operator errors could have occurred, including the failure to properly input or activate a job order, as required by the program, or the assignment of a job to the incorrect MO disc. Any one of those errors could have been the cause, but no final determination could be made because the computer system's log did not reflect which of the possible errors occurred.
>
> [ ] Tests performed on the equipment determined that it was functioning within its design specifications. DEA determined that the same operator was involved

(continued...)

Second, the Government contended that evidence derived from the blank-sealed recordings, *before the sealing obligation arose for those recordings,* should be admissible because 18 U.S.C. § 2517(1)-(2) permits the use of recordings for investigatory purposes. *Id.* at 11-12 (citing *United States v. Donlan*, 825 F.2d 653, 657 (2d Cir. 1987)). Confronting the prohibition in § 2518(8)(a) against the use or disclosure at trial of evidence derived from unsealed recordings, the Government contended that the prohibition should not be applied strictly. The Government urged the district court to adopt the United States Court of Appeals for the Second Circuit's broad construction of the statute, as explained in *United States v. Donlan*, 825 F.2d 653 (2d Cir. 1987).

In response, Mr. Martin contended that no excuse could justify the major delay in sealing that had occurred in his case. R.927. He refuted the Government's proposed excuse—operator error—as unsupported by the record because the Jasevicius affidavit stated that the DEA "was unable to conclude why the error occurred." *Id.* at 3. Furthermore, Mr. Martin contended that the Supreme

---

[9]  (...continued)

> in the job orders creating those MO discs which were found to be partially or completely blank. DEA has reassigned this technician to other responsibilities and taken other steps to ensure that the problem does not recur. Following the change in technicians, DEA has not experienced any similar problems.

R.882, Ex. 7, ¶¶ 5-6.

Court of the United States has not endorsed "mistaken belief" as a satisfactory explanation for a sealing error. *Id.* at 3-4 (citing *United States v. Ojeda Rios*, 495 U.S. 257 (1990)). Nor was lack of proof of alteration sufficient to excuse the sealing error because, according to the Supreme Court, "'[t]o hold that proof of nontampering is a substitute for a satisfactory explanation is foreclosed by the plain words of the sealing provision.'" *Id.* at 3 (quoting *Ojeda Rios*, 495 U.S. at 264). Finally, Mr. Martin contended that no derivative evidence should be admitted because *Donlan* and its broad construction of § 2518(8)(a) misunderstood "the context of the entire statute." *Id.* at 4.

The district court held an evidentiary hearing on the motion to suppress. The district court stated that, because the Government had volunteered not to use the actual tapes, the district court understood Mr. Martin's motion only to apply to "any information that's derivative of the tapes." Tr. at 3, Feb. 17, 2006. The district court wanted to know "exactly what information we are talking about." *Id.* In response, the Government explained that it had planned to use the blank-sealed recordings in draft affidavits and complaints to secure arrest warrants in October 2003. *Id.* at 11-12. Then, when the sealing problem was discovered in mid-October, the Government scrapped those drafts and decided simply to exclude the problematic calls from its investigation from that point forward. *Id.* However, the Government conceded that it had used information obtained from the blank-sealed recordings in order to prepare officers

while the wiretaps were still active—*i.e.*, during the investigation. *Id.* at 11. The Government raised its two arguments for why the derivative evidence—*any* derivative evidence—was admissible: the satisfactory excuse for non-sealing and the broad interpretation of § 2518(8)(a).

At the evidentiary hearing, Mr. Martin contended that the Government had the burden to show what evidence was derived from the blank-sealed recordings. *Id.* at 14, 22, 36, 39. He contended that the Government had failed to meet its burden, but, in any event, he posited that the derivative evidence was extensive because "during each one of these tapings [the Government] ha[d] agents monitoring these calls," "making line sheets and making summaries of the calls," and "making transcripts of the calls." *Id.* at 14; *see also id.* at 37. Mr. Martin contended that the line-sheets, summaries and transcripts were used throughout the Government's investigation, which "mushroom[ed] out from the wiretaps." *Id.* at 14-16; *see also id.* at 20 ("There is no way we can now go back and sort out and say, 'Well, they didn't use that[,] . . . they erased the knowledge that they obtained.'"). Mr. Martin suggested that if the Government could not establish what derivative use was made of the blank-sealed recordings, the proper sanction would be to dismiss the indictment. *Id.* at 21-22. He also reiterated his opposition to the Government's two arguments for the admissibility of the derivative evidence.

The district court suggested that this case was sui generis because the Government made a mistake in recording, not in sealing. *Id.* at 30-31. The district court

stated, "I am really uncomfortable with the idea that we ought to somehow say that everything during the taped period is off the—is somehow tainted in a way that requires dismissal of the indictment . . . . It seems to be a sledgehammer of relief when what we really need is much more of a precision tool." *Id.* at 33. Instead, the district court requested more information about how the Government had used its copies of the blank-sealed recordings and clarification on what exactly was derived from them. *Id.* at 34.

Another hearing was held, and Mr. Martin cross-examined DEA special agent Jeffrey Konvalinka, who had managed the investigation and the wiretap operation. Mr. Martin's counsel asked Agent Konvalinka about when and how the blank-sealed recordings were used. *See generally* Tr. at 70, Mar. 3, 2006 (describing how summaries and line-sheets were prepared as calls were recorded); *id.* at 71-72, 74-75 (describing how information derived from the blank-sealed calls was routed to officers to assist their surveillance efforts). Mr. Martin argued to the district court that the Government used the blank-sealed recordings to secure additional wiretap authorizations and, thus, that the sealing problem was so pervasive that the indictment must be dismissed. *See id.* at 104.

The district court declined to rule, despite the Government's request that the court do so, on the Government's first argument for admissibility: that the Government had a satisfactory explanation for the sealing error. The district court considered that issue to be "moot,"

because the court found that the blank-sealed recordings "were not used in connection with any ongoing arrests," "weren't presented to the grand jury," "weren't used in any affidavits for purposes of search warrants," "weren't used to draft any complaints," and "weren't used in connection with obtaining an indictment." *Id.* at 99, 101. The district court stated, "I haven't heard about what specific improper use of any of this evidence has happened." *Id.* at 100. Nevertheless, the district court seems to have concluded that at least some evidence was derived from the blank-sealed recordings.[10] The district court noted that the Government stopped using the blank-sealed recordings as soon as the sealing error was discovered and did not intend to use them as evi-

---

[10] Later in its ruling, the district court stated that "it is theoretically possible that some information that shows up in the line records or in the transcripts was in the minds of agents when they went out and did their further investigation," Tr. at 99, Mar. 3, 2006, and the district court recognized that the blank-sealed recordings had been included in the Government's probable cause affidavits to obtain additional wiretap authorizations, *id.* at 104. With respect to this derivative evidence, the district court appears to have agreed with the Government's theory that § 2518 should be applied broadly, as articulated by the United States Court of Appeals for the Second Circuit in *United States v. Donlan*, 825 F.2d 653 (2d Cir. 1987). In other words, the district court believed that § 2518 permitted use at trial of evidence derived from wiretap recordings, as long as the derivation occurred prior to the violation of the wiretap's sealing obligation. *Id.* at 100, 104-05.

dence at trial. Thus, the district court ruled that "the motion is effectively granted without objection." *Id.* at 99.

Mr. Martin proceeded to trial, during which 160 incriminating recordings of calls from the wiretapped phones and transcripts of the calls were admitted into evidence. *See generally* Trial Tr. at 85-86, 95-96, 103, 107, Aug. 30, 2006. Neither the blank-sealed recordings nor any transcripts of those recordings were admitted. Mr. Martin was convicted and sentenced to life in prison.

Mr. Martin appealed his conviction to this court, contending that the district court had erred by refusing to dismiss the indictment.[11] After hearing oral arguments and considering the parties' submissions, we maintained jurisdiction over the case and granted a limited remand to the district court to rule on whether the Government had a satisfactory explanation for the sealing error, the issue it had pretermitted earlier. *See* App. R.112 (No. 07-2272).

The district court considered the issue and ruled that "the government's explanation for its failure to seal is satisfactory." R.2374 at 3. The district court noted that

---

[11] Although the district court's ruling was characterized in terms of *granting* Mr. Martin's motion to suppress, the district court's March 3, 2006 ruling properly is understood as constituting a denial of the motion with respect to both the evidence derived from the blank-sealed recordings and Mr. Martin's request to dismiss the indictment. All parties have proceeded under that assumption.

the Government never has stated definitively the cause for the sealing error, but believed it was caused by operator error. The district court applied the framework articulated in *United States v. Coney*, 407 F.3d 871, 875 (7th Cir. 2005), and concluded that the Government's explanation was satisfactory. The district court noted that the Government's explanation was believable because all of the Government's actions had been consistent with its reasonable belief that it had, in fact, properly sealed the blank-sealed recordings. The district court did not find the length of delay in sealing to be "troublesome." *Id.* at 4. The district court believed the nature of the crime charged and the relative lack of notoriety of the defendants tended to support the Government's explanation because nothing about this narcotics conspiracy case was unusual. Finally, the district court considered the importance of the problematic recordings to be minimal because the Government did not use them once it realized that the sealing error had occurred and because they played no part during the trial.

### 3.

The parties' contentions before this court largely mirror the arguments made during the district court proceedings. Mr. Martin contends that the district court misapplied § 2518(8)(a). He contends that the district court should have found that the Government lacked a satisfactory explanation for the sealing error. He further contends that so much evidence was derived from the blank-sealed recordings that, without a satisfactory

explanation for the sealing error, much of the Government's evidence at trial should have been excluded. He asks that his conviction be reversed.

The Government concedes that the reconstituted recordings were not tendered for judicial sealing immediately upon the expiration of the wiretap authorizations. The Government urges us to interpret § 2518(8)(a) broadly so as not to require suppression of the derivative evidence. Alternatively, the Government contends that the operator error and the Government's good-faith attempt to comply with the sealing requirement constitute satisfactory explanations for its failure to comply with the sealing statute.

### 4.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 established a comprehensive statutory regime by which the Government may intercept wire, oral or electronic communications. *See* 18 U.S.C. §§ 2510-22; Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping: Surveillance in the Internet Age* § 1:10 (3d ed. 2009) (providing background); Wayne R. LaFave et al., *Criminal Procedure* §§ 4.5-4.6 (5th ed. 2009) (discussing the history of the Act and its amendments). The Act created procedural safeguards to protect individuals' privacy and to prevent other forms of misuse of wiretapping. *See generally* 18 U.S.C. § 2518 (establishing wiretap authorization procedures for the Government). One of the safeguards of this statute is a provision where-

by wiretap intercepts may be authorized only for thirty days at a time; any extension must comply with the same procedures required to obtain an initial wiretap authorization. *See* 18 U.S.C. § 2518(5).[12] The Act also strictly regulates how intercepted communication may be used or disclosed during and subsequent to a Government investigation. *See generally* 18 U.S.C. § 2517.

The Act requires that wiretap intercepts "shall, if possible, be recorded . . . in such a way as will protect the recording from editing or other alterations." 18 U.S.C. § 2518(8)(a). "Immediately upon the expiration of the period of the [wiretap authorization] order, or extension thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." *Id.* The purpose of this sealing requirement "is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990). "[T]he seal is a means of ensuring that subsequent to its placement on a tape, the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded." *Id.* We apply the immediacy requirement strictly. *See United*

---

[12] " '[A]n order authorizing surveillance of the same subject, at the same location, regarding the same matter as an earlier authorized surveillance, constitutes an "extension" of the earlier authorization . . . .' " *United States v. Jackson*, 207 F.3d 910, 916 (7th Cir. 2000) (quoting *United States v. Carson*, 969 F.2d 1480, 1488 (3d Cir. 1992)), *judgment vacated on other grounds*, 531 U.S. 953 (2000).

*States v. Coney*, 407 F.3d 871, 873 (7th Cir. 2005) ("'The term "[i]mmediately" means that the tapes should be sealed either as soon as practical after the surveillance ends or as soon as practical after the final extension order expires.'" (quoting *United States v. Williams*, 124 F.3d 411, 429 (3d Cir. 1997))); *see also* Fishman & McKenna, *supra*, § 19:10 (discussing other circuits' application of the immediacy requirement). The Supreme Court also has stated that "§ 2518(8)(a) applies to a delay in sealing, as well as to a complete failure to seal, tapes." *Ojeda Rios*, 495 U.S. at 264. Similarly, we believe that what occurred in this case, sealing blank recordings, does not comply with the sealing requirement. *Cf. id.* at 263 ("The presence or absence of a seal does not in itself establish the integrity of electronic surveillance tapes. Rather, the seal is a means of ensuring that subsequent to its placement on a tape, the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded."). Nor is the sealing of line-sheets or call summaries a proper method of compliance.

The sealing provision includes its own exclusionary remedy: "The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsec-

tion (3) of section 2517."[13] 18 U.S.C. § 2518(8)(a).[14]

The Supreme Court has noted that the satisfactory explanation prong of § 2518(8)(a) "require[s] that the

---

[13]  Subsection (3) of § 2517 provides:

> Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

[14] The United States Court of Appeals for the Second Circuit has articulated an interpretation of the § 2518(8)(a) exclusionary remedy that would permit certain uses of wiretap recordings, despite the lack of a satisfactory explanation for a violation of the statute's immediate sealing requirement. *See United States v. Donlan*, 825 F.2d 653 (2d Cir. 1987). As best we can tell, this interpretation has not been adopted by any other court of appeals. *See* Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping: Surveillance in the Internet Age* § 19:8 (3d ed. 2009) (suggesting that courts have divided over the correctness of the *Donlan* interpretation). Although the parties differ over the correctness of *Donlan*, and therefore the propriety of the district court's application of *Donlan*'s rationale, *see supra* note 10, resolution of this issue is unnecessary. The Government has provided a satisfactory explanation for its sealing error, and our discussion will be limited to that aspect of the statutory provision.

Government explain not only why a delay occurred but also why it is excusable." *Ojeda Rios*, 495 U.S. at 265. In *Ojeda Rios*, the Supreme Court concluded that the Government's "good-faith, objectively reasonable misunderstanding of the statutory term 'extension'" was a satisfactory explanation for the Government's failure to seal immediately wiretap recordings. *Id.* at 264-66.[15] The Supreme Court insisted on a showing of "good cause for the sealing delays" and rejected the Government's attempt to show merely that no tampering with the

---

[15] However, the Court remanded the case so that the district court could determine whether the Government's proffered explanation was supported by the factual record developed before the district court. Courts of Appeals similarly have reviewed this issue on the basis of an evidentiary record. *See, e.g.*, *United States v. Wilkinson*, 53 F.3d 757, 759-60 (6th Cir. 1995) (considering the Government's explanation for delayed sealing as articulated during a "lengthy evidentiary hearing"); *see also United States v. Ojeda Rios*, 495 U.S. 257, 267-68 (1990) (O'Connor, J., concurring) ("[A] 'satisfactory explanation' . . . cannot merely be a reasonable excuse for the delay; it must also reflect the actual reason for the delay" and "should be based on the findings made and evidence presented in the district court, rather than on a *post hoc* explanation given for the first time on appeal."). *But see Jackson*, 207 F.3d at 918 (examining a Government's proffered explanation that was unsupported by evidence submitted to the district court); *United States v. Hoover*, 246 F.3d 1054, 1063-65 (7th Cir. 2001) (Rovner, J., concurring) (criticizing *Jackson*'s reliance on arguments not included in the evidentiary record). In this case, we rely solely on arguments supported by the factual record developed in the district court.

recordings had occurred. *Id.* at 264-65 ("To hold that proof of nontampering is a substitute for a satisfactory explanation is foreclosed by the plain words of the sealing provision."). We have noted that "what should be deemed 'satisfactory' in the context of a statute aimed at preventing government tampering with electronic evidence" must depend largely on "the statutory objective." *Coney*, 407 F.3d at 875. A satisfactory explanation must dispel any reasonable suspicion of tampering, and also must be both accurate and believable. *Id.* Whether the explanation is satisfactory also may depend on the delay in sealing, unique pressure on the Government to obtain a conviction due to particularly notorious charges or defendants, the importance of the recordings to the Government's case and whether the Government has established a procedure for complying with its sealing obligations. *Id.*; *cf. United States v. Mora*, 821 F.2d 860, 867-69 (1st Cir. 1987) (listing additional factors that the court believed contributed to satisfactoriness but stressing "that there is no stock formula by which the adequacy of an explanation can invariably be gauged").

In *Coney*, we applied these principles and held that "mixed-signals" between Assistant United States Attorneys qualified as a satisfactory explanation for a ten-day delay in sealing. *Coney*, 407 F.3d at 875. In other cases, we have concluded that a prosecutor's mistaken belief, caused by recording technicians' delay, about the time needed to secure a replacement recording device constituted a satisfactory explanation, *see United States v. Jackson*, 207 F.3d 910, 918 (7th Cir.), *judgment vacated on other grounds*, 531 U.S. 953 (2000), as did a bureaucratically

caused delay, *see United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995).

We review for clear error a district court's conclusion that the Government's explanation for failing to seal immediately wiretap recordings is satisfactory. *See Coney*, 407 F.3d at 874.[16]

**5.**

We begin by noting that evidence *was* derived from the blank-sealed recordings. Although the district court did not specify the extent of the derivative evidence, it stated that "it is theoretically possible that some information that shows up in the line records or in the transcripts was in the minds of agents when they went out and did their further investigation," Tr. at 99, Mar. 3, 2006, and the district court recognized that the blank-sealed recordings had been included in the Government's probable cause affidavits to obtain additional wiretap authorizations, *id.* at 104; *see also supra* note 10. We also believe the factual record would support a finding that at least some derivative evidence existed.

---

[16] In *United States v. Coney*, 407 F.3d 871 (7th Cir. 2005), we employed the "clearly erroneous" standard while conceding that other circuits review this determination de novo. *See, e.g.*, *United States v. Reed*, 575 F.3d 900, 913 (9th Cir. 2009); *United States v. Cline*, 349 F.3d 1276, 1284 (10th Cir. 2003); *United States v. Sawyers*, 963 F.2d 157, 159 (8th Cir. 1992); *United States v. Maldonado-Rivera*, 922 F.2d 934, 949-50 (2d Cir. 1990). *But see Wilkinson*, 53 F.3d at 759-60. In this case, we would reach the same result under either standard.

Our review of the record reveals that portions of the Government's investigation relied on, at least in part, the contents of the blank-sealed recordings. For example, excerpts of probable cause affidavits show that the Government frequently cited the communication heard on the blank-sealed recordings to secure subsequent wiretap authorizations. *See, e.g.*, R.882-7 at 425; R.882-8 at 253, 255-56, 293; R.882-9 at 341-42. Also, Agent Konvalinka testified that the contents of the blank-sealed recordings were relayed to other officers to assist with the pending investigation. Because the Government voluntarily suppressed the blank-sealed recordings themselves, the derivative evidence properly was the subject of Mr. Martin's motion to suppress.

As we have noted earlier, the district court, applying the factors set forth in *Coney*, concluded that the derivative evidence need not be excluded because the Government provided a satisfactory explanation for its improper sealing. We agree. The record establishes that operator error most likely caused the blank-sealed recordings to be defective. The district court placed this error in the proper context. The error had more to do with the mechanics of the recording process than with the Government's established sealing procedures. Throughout the course of its investigation, the Government acted consistent with its sealing obligations and attempted in good faith to rectify its sealing error once it was discovered. The statutory objectives were essentially satisfied: The Government obtained valid judicial authorization for its wiretap intercepts, recorded the communications onto non-editable MO discs and sealed original copies of the MO discs with judicial authoriza-

tion.[17] The fact that a few of those tapes were defective was unknown until the Government's investigation nearly was completed, and the sealing error certainly did not interfere with the statutory objectives of ensuring judicial oversight and non-tampering with wiretap recordings. *Cf. Ojeda Rios*, 495 U.S. at 266-67 (concluding that the Government's understanding of the law of extensions was erroneous but, nonetheless, did not interfere with the statutory objectives, and, thus, qualified as an objectively reasonable excuse for the Government's sealing delay).

Mr. Martin has not alleged that the Government obtained a tactical advantage by sealing the blank MO discs, that the Government procrastinated or otherwise acted in bad faith. Indeed, the record is completely devoid of any such evidence. *Cf. United States v. Quintero*, 38 F.3d 1317, 1328-30 (3d Cir. 1994) (rejecting the prosecutor's heavy workload as a satisfactory explanation for a sealing delay because to do so "would be rendering extraordinary that which is ordinary"); *United States v. Carson*, 969 F.2d 1480, 1498 (3d Cir. 1992) (rejecting the need to enhance the audibility of tapes as a satisfactory explanation for a sealing delay because that need was

---

[17] We have considered previously the reliability of MO discs and their non-editable characteristic. *See United States v. McLee*, 436 F.3d 751, 763-65 (7th Cir. 2006). The fact that the Government used MO discs in this case contributes to our conclusion that the sealing error is no cause for concern that tampering occurred.

"readily foreseeable and could just as readily become routine"). We believe the context in which the sealing error occurred in this case supports the Government's explanation.

Although the delay in sealing was significant—approximately thirty-eight days for the reconstituted recordings, and *never* for the recordings that were lost, *see supra* note 7—the Government exhibited substantial compliance with the immediacy requirement by attempting to address the sealing error the same day the Government discovered that it had occurred. We agree with the district court that the delay in sealing is excusable under these circumstances. The charges in this case were unexceptional, and the record does not suggest that the defendants were particularly notorious. The Government had no unique incentive in this case to ignore intentionally its sealing obligations. *See Coney*, 407 F.3d at 875.

The Government had well-established procedures in place to ensure compliance with its sealing obligations, a consideration that contributes to the believability of the Government's explanation. *Cf. id.* (noting that the Assistant United States Attorneys had established a procedure for complying with their statutory sealing duties). For example, although the Government was obligated to seal the wiretap recordings only upon the expiration of the final *extension period* for Messrs. Martin's and Simmons's phones, *see* 18 U.S.C. § 2518(8)(a), the Government sealed the MO discs upon the completion of each thirty-day authorized period, *see* R.882 at 2. In

this regard, the Government followed established Department of Justice protocols.[18]

Finally, we agree with the district court's conclusion that the blank-sealed recordings were of relatively minor importance to the Government's case. The Government's voluntary suppression of the recordings themselves indicates how small a role they played in the Government's case against Mr. Martin. Although our review of the probable cause affidavit excerpts reveals that the contents of the blank-sealed recordings were used to obtain certain wiretap extensions, they were hardly the linchpin of these affidavits. Furthermore, the blank-sealed recordings were a small subset of the wiretap recordings the Government created in this case, most of which were sealed properly. The blank-sealed recordings' minimal importance contributes to our conclusion that the Government's explanation is satisfactory.

The Government provided a satisfactory explanation in this case and therefore no evidence was excludable under § 2518(8)(a). We therefore affirm the ruling of the district court that the Government's explanation was satisfactory.

---

[18] *See* Department of Justice's Electronic Surveillance Manual 28-30 (June 2005), *available at* http://www.justice.gov/criminal/foia/docs/elec-sur-manual.pdf (encouraging Assistant United States Attorneys to seal wiretap recordings at the completion of each authorized thirty-day period, irrespective of whether an extension is obtained).

## B.  Sixth Amendment Challenges

### 1.

Messrs. Martin, Bell and Terrell contend that the district court violated their Sixth Amendment rights by limiting their ability to cross-examine James Rudy Taylor ("Rudy"). Rudy was a member of the Mafia Insanes who worked for Mr. Simmons and managed a drug spot. Rudy was a named defendant in the indictment.[19] He eventually pleaded guilty and entered into a cooperation plea agreement with the Government whereby he agreed to testify against Messrs. Martin, Bell and Terrell, among others, in exchange for a Government recommendation that he receive a reduced sentence. *See* R.737-38, 764.

During the Martin/Bell trial,[20] defense counsel informed the district court that the defense intended to cross-examine Rudy about his involvement in a pending state murder investigation being conducted by the Police Department in Maywood, Illinois. Defense counsel knew that, when Rudy was arrested by federal agents for his role in the Mafia Insanes conspiracy, the Government had made Rudy available to the Maywood Police for

---

[19] Rudy was charged in Count One (the conspiracy charge), and also with two firearm counts, in violation of 18 U.S.C. §§ 922(g)(1) and 922(k), and one count of using a telephone to facilitate a narcotics conspiracy, in violation of 21 U.S.C. § 843(b).

[20] As noted above, Messrs. Martin and Bell were tried separately from Mr. Terrell.

questioning. Defense counsel believed that Rudy had given a statement to the Maywood police concerning his involvement in the murder of an individual named Curtis Rios.[21] Defense counsel asked the district court to permit cross-examination of Rudy about whether he expected to receive any benefit in the state murder investigation in return for giving testimony in the Martin/Bell trial.

---

[21] A defense counsel explained his understanding of the Maywood investigation and the statement as follows,

> [Rudy] gave a confession—that's my word—a statement on May 20th, 2004, when he was picked up, basically, on another case, which was a murder, and this case.

> . . . [T]his confession that he gave, . . . is five pages in length, handwritten, signed by him . . . .

> My reading of it is that it was over a drug debt—or, I am sorry—over some drugs; that it has to do with a spot regarding the Mafias; that he shot this individual in the foot, and then unloaded the gun on him; that he went ahead, this individual, whose name is Curtis Rios, . . . a/k/a "Cheese," who died the next day.

> [Rudy] . . . went ahead and got rid of his own gun almost immediately thereafter and kept or held on to Cheese's gun for something like a month. I think that he basically says he had nine rounds and he emptied it.

> We don't have an autopsy report. We don't have those kinds of things, Judge.

Trial Tr. at 1604-05, Sept. 18, 2006.

The Government contended that the defense should not be permitted to question Rudy about the pending state murder investigation. The Government said that it had arranged no benefit for Rudy with the Maywood investigators in exchange for his cooperation in the federal case. According to the Government, the federal investigators had "talked with Maywood about working some type of concurrent deal. They were unwilling to do it, so we didn't do anything with it. That's it." Trial Tr. at 1606, Sept. 18, 2006. The Government argued that under Federal Rule of Evidence 609, the Maywood murder investigation was not a proper subject for cross-examination because Rudy had not been convicted;[22] nor was it admissible under Rule 608(b) because the alleged offense "has nothing to do with truth-telling." *Id.* at 1607. The Government also informed the defense and the district court that, if asked about the Maywood murder investigation, Rudy intended to invoke his Fifth Amendment right not to incriminate himself. *Id.* at 1605.

The district court stated, "Whether it's a murder or a traffic offense, if it's an arrest, it's not admissible unless there is a benefit given. And I understand, from what everybody tells me, there has not been a benefit given." *Id.* at 1606. The district court also noted that the statement given to the Maywood investigators could be used by the defense to impeach Rudy if he testified about the

---

[22] The defense and the Government agreed that Rudy had not been charged with the murder of Curtis Rios. *See* Trial Tr. at 1606, Sept. 18, 2006.

Maywood murder on direct. *Id.* at 1607. However, the district court did not know whether that contingency would occur. It therefore permitted a voir dire of Rudy to determine whether he intended to testify about the Maywood murder and whether he expected to receive any benefit in that case in exchange for his cooperation in the federal action. *Id.* at 1607-08.

A voir dire was conducted. Defense counsel asked Rudy if he had given a statement concerning the murder of Curtis Rios. Rudy declined to answer, invoking the Fifth Amendment. *Id.* at 1610. Defense counsel then asked Rudy whether he expected to receive any benefit from the Government in exchange for his cooperation in the federal action. Rudy said that he expected to receive no benefits. *Id.* at 1610-15.

At a sidebar, the district court told defense counsel,

> If you can establish that [Rudy] has an expecta-tion that he is getting a pass on something out in Maywood as a result of his testimony here, I will then allow you to ask about what it is out in Maywood that he thinks he is getting a pass on. But until that predicate has been laid, there is no basis to inquire into this.

> And I will just tell you, the 403 balancing goes in favor of the government as well. I'm not— I don't think it's appropriate to ask about this, as I understand it, unrelated murder.

*Id.* at 1622. Defense counsel contended that the May-wood murder *was* related to the drug activity charged

in the federal indictment. *Id.* Defense counsel wanted to clarify whether Rudy intended to invoke the Fifth Amendment if asked about the murder. *Id.* at 1623. The district court stated, "I don't think there is any basis, from what I have heard right now, that we ought to even open the door to his taking the Fifth on this. Nor do I think there is any particular benefit to the defendants in letting the jury know that there was a gang-related murder." *Id.* at 1627. The district court proposed that defense counsel focus its voir dire questions on whether Rudy expected any deal from the Maywood investigators. *Id.*

  Instead, defense counsel asked Rudy about his plea agreement with the Government and what he expected to gain from testifying in the Martin/Bell trial. *Id.* at 1628. Obviously confused by defense counsel's questions, Rudy said he expected to receive no benefits at all. *Id.* The district court interjected and asked Rudy if he understood that, in the written plea agreement with the Government, the Government agreed to recommend a reduced sentence for Rudy in the federal action in return for his cooperation. *Id.* Rudy confirmed that that was his understanding, and he indicated that he understood that the Government's favorable recommendation at his sentencing hearing would depend on whether he told the truth during his trial testimony. *Id.* at 1628-29. The district court asked Rudy,

> [H]ave you received any other agreement from the government? Have they offered you anything else? . . . Has the government offered you any

benefits in any other case? . . . Has the government offered to do anything for you in connection with any other charges? . . . Is it your expectation or hope that the government is going to do something in some other case for you?

*Id.* at 1629-30. Rudy answered no to each of those questions. *Id.*

Defense counsel then resumed the voir dire questioning and asked Rudy if it was his "understanding that a member of the U.S. Attorney's Office called the State's Attorney's office out in Maywood?" *Id.* at 1630. Rudy said no. *Id.* Defense counsel asked, "Did your lawyer talk to you at all about any efforts on the part of the U.S. Attorney to work out your case, your prospective case, in Maywood?" *Id.* The district court interjected and said, "I want to tell the witness that he has permission not to answer questions about communication with his lawyer . . . . It doesn't relate to the Fifth Amendment. It's an independent privilege." *Id.* at 1630-31. Defense counsel then asked Rudy, "Sir, do you expect to be charged out in Maywood?" *Id.* at 1631. The Government objected and complained that the question "go[es] back to the statement again." *Id.* The district court sustained the objection and said, "I think we should bring the jurors in. We are not going to pursue this line of questioning in the jurors' presence unless the witness' testimony changes." *Id.*

Defense counsel sought to clarify the ruling and asked, "Judge, are we precluded from any other questions about benefits when he is on the stand?" *Id.* at 1632.

The district court stated, "No. You are welcome to ask questions about benefits, without reference to this—." *Id.* Unsatisfied, defense counsel sought permission to continue the voir dire and ask additional questions about the Maywood murder, which the court allowed. The following colloquy occurred:

> [DEFENSE COUNSEL]:   Are there any outstanding offenses that you are concerned about the Judge knowing about at this point?

> [THE GOVERNMENT]:   Objection, Judge. It's forcing this witness to take Five on this again.

> [DEFENSE COUNSEL]:  I am not asking him to take Five. I am only asking him whether or not he is concerned about it.

> [THE GOVERNMENT]:  If he says yes, the next question is what offenses? Judge. And then we are back to the statement.

> [DEFENSE COUNSEL]:  That wasn't going to be my next question, Counsel.

> [THE GOVERNMENT]:  If he says he is concerned, it also is potentially admissible.

> THE COURT:  Look, there are ways that you can ask questions that would elicit this. I have made a 403 decision here that we ought not proceed down this line. So questions that are designed to elicit evidence concerning the episode in Maywood, I am going to sustain those objections, unless there is an indication that the wit-

ness has a genuine expectation of a benefit
in connection with that. And there has been
no such showing.

*Id.* at 1634.

Still unsatisfied, defense counsel sought permission
to continue the voir dire and ask additional ques-
tions about benefits Rudy expected to receive from his
cooperation. The district court allowed further ques-
tioning. Defense counsel asked Rudy about his plea
agreement, and Rudy confirmed that it was his under-
standing that, in return for his guilty plea and truthful
testimony in the federal action, the Government would
recommend that he receive a lower sentence. *Id.* at 1636.
The Government asked to clarify the record and asked
Rudy, "Sir, if you have cases out in Maywood, or poten-
tial cases, do you understand that by cooperating with
the government that those will go away?" *Id.* Rudy an-
swered, "No." *Id.* at 1637. Defense counsel then
asked, "Do you expect the government to do anything
whatsoever to try to help you in that potential case in
Maywood?" *Id.* Rudy responded, "I refuse to answer,
your Honor. . . . I plead the Fifth." *Id.* Defense counsel
said, "That's the crux of this, Judge. . . . That's it." *Id.* The
district court stated, "It isn't the crux. The witness has
testified about this matter. I don't think we should
pursue it any longer." *Id.* The voir dire ended.

The trial resumed, and Rudy testified on behalf of the
Government, describing his role in Mr. Simmons's drug
operation and, more generally, the involvement of the
Mafia Insanes gang. *See id.* at 1645, 1669-71, 1679-81.

Defense counsel did not cross-examine Rudy about the Maywood murder investigation. However, defense counsel attempted to impeach Rudy in other ways. For example, defense counsel asked Rudy about his prior arrests and about aliases that he had given to the police during those arrests. *See id.* at 1706-08. Defense counsel also asked Rudy about his prior drug abuse. *See id.* at 1715-17. Defense counsel asked Rudy why he left certain information out of his proffer statement given to the DEA. *See id.* at 1721-22. Defense counsel also asked Rudy about minor inconsistencies in his testimony. *See id.* at 1763. Finally, defense counsel asked Rudy about the plea agreement with the Government; Rudy confirmed that, if he testified truthfully, the Government would dismiss certain charges pending against him and recommend that he be sentenced at a level one-third below the low end of his applicable Guidelines range. *See id.* at 1723-26, 1732-37.

The trial continued, and other witnesses offered testimony that further incriminated the defendants. Messrs. Martin and Bell ultimately were convicted and sentenced.

**2.**

Approximately a year after the Martin/Bell trial had concluded, Mr. Terrell was tried separately, and the Government again called Rudy as a cooperating witness. The Government reminded the district court about the substance of Rudy's testimony in the Martin/Bell trial.

The Government asked for the same evidentiary ruling barring cross-examination concerning the Maywood murder investigation. The district court asked defense counsel if she objected, to which she responded, "[T]he only thing I would ask is for another voir dire so we can talk to him and make sure he doesn't think that this murder that he confessed to is in any way associated with the deal he is getting from the government." Trial Tr. at 341, Jul. 12, 2007. The district court asked the Government to begin, and the following voir dire occurred:

[BY THE GOVERNMENT:]

Q. [Rudy], you were questioned by people from the Maywood Police Department about a shooting, weren't you?

A. Yes, sir.

Q. You have got a cooperation deal in this case, don't you?

A. Yes, sir.

Q. Do you understand that cooperation deal to have taken care of any possible situation you have in Maywood?

A. No, sir.

Q. Do you know if the United States Attorney's Office or DEA or anybody reached out to Maywood to, I guess for lack of a better term, make that case go away?

A.  No, sir.

Q.  What is your cooperation agreement—what charges do you understand your cooperation agreement to take care of or resolve?

A.  Contending this case here that I am on.

Q.  Just this case?

A.  Yes.

Q.  Does it take care of any other possible charges?

A.  No, not to my knowledge.

[THE GOVERNMENT:]  I don't have any further questions, your Honor.

[THE COURT:]   Any cross-examination . . . ?

[DEFENSE COUNSEL:]  Thank you.

[BY DEFENSE COUNSEL:]

Q.  Have you been charged with stuff in Maywood?

A.  I plead the Fifth on that.

Q.  Do you know if any charges have been filed against you?

A.  Yes, sir—yes, ma'am.

Q.  They have been filed against you?

A.  The charges that I am up against now.

Q.  In Maywood, out of that?

A.  I plead the Fifth on that.

[DEFENSE COUNSEL:] Your Honor, I think he waived it by answering their questions. And now to invoke it for just this limited part—

[THE GOVERNMENT:] Judge, if I can just step in for a moment.

[Rudy's counsel] was here this morning. I absolutely do not want to get into what [she and Rudy] talked about . . . but it would be—I guess I understand that this is not an area where he is going to be willing to answer any questions on.

Maybe it makes sense to get [Rudy's counsel] here if this is going to be something that we need to go into, but my sense is we have covered this ground already. Nothing has changed since then.

[THE COURT:] Here is what I want to do. I am going to bring the jury back right now, and what we can do with respect to this issue is get [Rudy's counsel] over here, see whether that changes anything with respect to whether or not he is willing to answer the question about whether charges have been filed. And if we need to reopen his testimony for some reason, we can do that.

*Id.* at 342-44. Mr. Terrell's defense counsel did not object to that plan.

The trial resumed and Rudy testified about Mr. Terrell's role in the Mafia Insanes conspiracy. Defense counsel did not cross-examine Rudy about the Maywood murder investigation. However, defense counsel impeached Rudy by asking him about prior inconsistent statements

that he had given to police and agents, *see id.* at 381-83, 386-87, his prior charges, *see id.* at 387-90, and about his plea agreement with the Government, *see id.* at 400-02. Rudy's testimony concluded, and he was excused.

Later in the trial, the district court returned to the issue of Rudy's testimony and summoned Rudy for an additional voir dire. Rudy's counsel appeared and the following exchange occurred:

[BY THE GOVERNMENT:]

Q.  I just have a few questions for the purpose of follow-up.

[Rudy], we talked about your plea agreement previously. Do you understand that cooperation/plea agreement that you have to extinguish or take care of any potential cases that might arise in Maywood, Illinois?

A.  No, sir.

Q.  And so do you understand that you received a benefit regarding anything that might have happened in Maywood, Illinois from the United States Attorney's Officer in connection with your plea agreement?

A.  No, sir.

[THE GOVERNMENT:]  No   further questions, Your Honor.

The Court: Cross-examination?

[DEFENSE COUNSEL:]  Thank you.

. . . .

[BY DEFENSE COUNSEL:]

Q. Now, the case that we're talking about is a case in Maywood involving a murder, correct?

A. Yes, yes, ma'am.

Q. And you were questioned about that murder the day you were arrested on this case, right?

[RUDY'S COUNSEL:]  Your Honor—

BY THE WITNESS:

A. Plead the Fifth.

[RUDY'S COUNSEL:]  —I would object to this. I think that [Rudy] has a right to exercise his Fifth Amendment if we're going to talk about the statement.

THE COURT:  Well, the question was: Were you questioned about that Murder?

[DEFENSE COUNSEL:]  Yeah, I'm not going to get into—

THE COURT:  Overruled. You may answer.

   Were you questioned about that murder when you were arrested back in '04 in this case?

BY THE WITNESS:

A. I was asked about it.

[BY DEFENSE COUNSEL:]

Q. Okay. And have you been—are there any charges resulting from that murder against you currently?

A.  No, ma'am.

Q. Okay. So you—do you have any cases at all pending anywhere else but the case that's here right now?

A.  Traffic, traffic, ma'am.

Q.  Okay. Now, are you aware if the federal government has spoken to any of the assistant state's attorneys out in Maywood regarding that case?

A.  No, ma'am.

Q.  Do you believe that you are going to be indicted in that Maywood case?

A.  No, ma'am.

Q.  Do you believe that your cooperation in this case, meaning your testimony against other people in this case and in other federal cases, is going to help you so you won't be charged in that Maywood case?

A.  No, ma'am.

[DEFENSE COUNSEL:] Nothing further.

THE COURT:   All right. Do we need to take any further steps with this witness?

[DEFENSE COUNSEL:]  I do not.

Trial Tr. at 566-69, Jul. 16, 2007. The voir dire concluded, and Rudy was excused. The trial resumed, and Mr. Terrell's defense counsel did not raise the Rudy cross-examination issue again. Mr. Terrell ultimately was convicted.

Mr. Terrell filed a post-trial motion for acquittal, contending that the district court's earlier ruling circumscribed improperly his cross-examination of Rudy. *See* R.1875. The motion stated that Mr. Terrell was prevented from determining whether Rudy "may have had [a subjective belief] regarding any promise the state made to him regarding possible murder charges not being brought in exchange for his testimony in this conspiracy trial." *Id.* at 1. The motion continued, "In light of the fact [that Rudy] was arrested on this conspiracy charge and immediately brought to the Maywood Police Department in reference to the murder charge, the substance of the conversation [he] had with the Maywood police would be relevant as to the reasonableness of his subjective belief." *Id.* at 2. The motion did not allege specifically that the district court's ruling violated Mr. Terrell's constitutional rights.

Soon thereafter, Mr. Terrell substituted counsel, and his new counsel filed an amended post-trial motion, renewing the contention that the district court's ruling limiting the cross-examination of Rudy about the Maywood murder investigation was erroneous. Specifically, Mr. Terrell contended, "By denying Mr. Terrell the right to investigate this weakness in [Rudy's] testimony, the [district court] violated Mr. Terrell's right under the Confrontation Clause. U.S. Const. Amnd. V [sic]." R.1890 at 3.

The Government opposed the motion, contending that Mr. Terrell had waived his opportunity to challenge the district court's ruling. *See* R.2026 at 9. The Government

noted that, when it had sought the same evidentiary ruling that the district court had made in the previous Martin/Bell trial, Mr. Terrell's trial counsel never objected and only requested that a voir dire occur. *See id.* at 10. The Government stated that "defense counsel even confirmed after the voir dire that the voir dire questioning was all that counsel sought." *Id.* at 11 (citing Trial Tr. at 569, Jul. 16, 2007). The Government further argued that, in any event, Mr. Terrell's complaint was meritless because Rudy had denied any expectation of benefit related to the Maywood murder investigation and that Rudy's alleged motive to lie was purely speculative. *Id.* at 11-12. The Government also contended that "cross-examination on this topic would [have] . . . cause[d] much confusion and waste of time," "precisely the sort of confusion and waste that Federal Rule of Evidence 403 would prohibit." *Id.* The Government noted that "[o]f course, [the district court] did not even have to make a specific Rule 403 determination during Terrell's trial because he waived the issue after the satisfactory voir dire." *Id.* at 12.

The district court denied the motion; it ruled that Mr. Terrell's right to confrontation had not been violated by the ruling limiting cross-examination of Rudy. *See* R.2130. The district court explained, "The right of confrontation does not require that a defendant be permitted to explore any and all avenues of bias. Nor was [Rudy's] testimony the only (or even the most important) evidence against the Defendant. The court concludes that a new trial is not warranted due to this evidentiary ruling." *Id.* at 2 (internal citations omitted).

**3.**

Messrs. Martin, Bell and Terrell appeal the district court's rulings limiting their ability to cross-examine Rudy about the Maywood murder investigation. They contend that the Sixth Amendment guaranteed them the right to cross-examine Rudy in front of the jury about whether he was biased in favor of the prosecutors because of his desire to secure their assistance with the pending Maywood murder investigation. *See* Martin/Bell Appellant's Br. 9-10; Terrell Appellant's Br. 13. The defendants suggest that they should have been permitted to establish the following facts before the jury: "1) that [Rudy] was suspected of murder in state court; 2) that [Rudy] had not yet been prosecuted for that murder; 3) that [Rudy] was first informed of that murder investigation immediately following his arrest by the federal government in this case; 4) that the federal authorities delivered [Rudy] to the state officials for interrogation regarding that murder; 5) that [Rudy] had made a statement to state authorities admitting his involvement in the murder; and 6) that [Rudy] was never prosecuted for the murder to which he confessed after he began cooperating with federal authorities." Martin/Bell Appellant's Br. 10. They explain that, "[b]ased on these facts, a reasonable juror could infer that [Rudy] was manufacturing incriminating testimony against the defendant-appellants in order to minimize his culpability in the investigation and avoid prosecution for

the murder." *Id.*; *see also id.* at 13-14, 17-19.[23]

Messrs. Martin, Bell and Terrell emphasize that Rudy's alleged bias arising from his expectation of a benefit in the Maywood murder investigation was a "core" concern of the Sixth Amendment because it represented "an entire source of bias" that the jury never heard about. *Id.* at 11-14. They point to *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), and *Davis v. Alaska*, 415 U.S. 308 (1974), decisions establishing that cross-examination regarding a witness's bias created by the threat of prosecution for matters unrelated to the crime about which the witness testifies is a core concern of the Sixth Amendment. *See* Martin/Bell Appellant's Br. 14. They contend that all of Rudy's testimony should have been stricken or a mistrial declared because Rudy relied on the Fifth Amendment when he was asked about the Maywood murder investigation. *Id.* at 21-23. They believe that Rudy's bias was a core concern of the Sixth Amendment, and, therefore, his Fifth Amendment right should not have trumped the defendants' Sixth Amendment rights.

The Government contends that the Sixth Amendment does not guarantee an unfettered right to cross-examine

---

[23] The defendants do not contend that the Government violated its disclosure obligations by withholding any information about the Maywood murder investigation. They base their theory that Rudy was inclined to fabricate testimony in favor of the Government entirely on the facts brought out during the pretrial and trial proceedings and inferences drawn from those facts.

and that the right may be limited by courts to avoid causing prejudice, confusion or delay. Appellee's Br. 31. In the Government's view, the Maywood murder investigation was strictly a collateral matter because there was no evidence showing that Rudy expected or hoped for any benefit in the Maywood murder investigation. *Id.* at 31-32. The Government notes that the defendants had ample opportunity to and did establish Rudy's bias arising from his cooperation plea agreement and that the defendants impeached Rudy by asking him about his prior convictions and inconsistent statements. *Id.* at 31-32, 34-35. Additionally, the Government contends that Rudy's invocation of his Fifth Amendment right not to incriminate himself insulated the district court's ruling circumscribing questioning about the Maywood murder investigation; the Government believes that such questioning involved a collateral matter and therefore paled in comparison to Rudy's important Fifth Amendment right. *Id.* at 33, 36.[24]

---

[24] Additionally, the Government renews its contention, which it made to the district court, but which the district court did not rule on, that Mr. Terrell "failed to object to Rudy's testimony and thus forfeited [his Sixth Amendment] claim." Appellee's Br. 30 n.10. We disagree with the Government's characterization of the record. Although Mr. Terrell's counsel did not specifically articulate a Sixth Amendment objection during the trial, counsel evinced an intention to cross-examine Rudy about the Maywood murder investigation in order to show Rudy's bias in favor of the Government. Furthermore,

(continued...)

**4.**

The Sixth Amendment to the Constitution of the United States ensures that a defendant be given an opportunity for *effective* cross-examination. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51-53 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). Nevertheless, trial courts retain wide discretion to impose reasonable limits on cross-examination in order to curb harassment, prejudice, confusion of issues, threats to witness safety and testimony that is repetitive and only marginally relevant. *Van Arsdall*, 475 U.S. at 679; *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006).

When a district court's limitation of cross-examination directly implicates the values protected by the Confrontation Clause of the Sixth Amendment, we review the district court's ruling de novo; otherwise, we review the district court's limitation of cross-examination under the more deferential abuse of discretion standard. *See Smith*, 454 F.3d at 714. At issue here is the district court's limitation of the defendants' cross-examination of Rudy about his alleged pro-Government bias because of a desire to curry favorable treatment in connection with the Maywood murder investigation. "Bias is a term used in the 'common law of evidence' to describe the rela-

---

[24] (...continued)
Mr. Terrell's post-trial motion amplified the constitutional arguments in support of that issue. The objection was sufficiently preserved. *See United States v. Glover*, 479 F.3d 511, 517 n.1 (7th Cir. 2007).

tionship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984). Cross-examination designed to elicit witness bias directly implicates the Sixth Amendment. *See Abel*, 469 U.S. at 49-52; *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974); *Alford v. United States*, 282 U.S. 687, 691-92 (1931). Consequently, our review is de novo. If a Sixth Amendment violation occurred, we shall set aside the verdict unless the Government establishes that the error was harmless beyond a reasonable doubt. *See Van Arsdall*, 475 U.S. at 684; *United States v. Nelson*, 39 F.3d 705, 710 (7th Cir. 1994).

The exposure of a witness's bias directly implicates the Sixth Amendment. *See Abel*, 469 U.S. at 52 ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). As we noted in *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009), "[a] core value [of the Sixth Amendment] is the ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie." Proof of bias "is the 'quintessentially appropriate topic for cross-examination.'" *United States v. Manske*, 186 F.3d 770, 777 (7th Cir. 1999) (quoting *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir. 1993)).

We believe that the situation before us today clearly implicates the defendants' rights to meaningful cross-examination with respect to witness bias. The Govern-

ment had made Rudy available to state prosecutors for questioning about the Maywood murder. Rudy conceded that he had given a statement to those prosecutors with respect to that murder and that he never was charged with that murder. He denied the existence of a quid pro quo with the state or federal prosecutors. The district court took the view that the Maywood murder was "unrelated" to the issues on trial. *See* Trial Tr. at 1622, Sept. 18, 2006 ("I'm not—I don't think it's appropriate to ask about this, as I understand it, unrelated murder.").

We respectfully take a different view from the one taken by our colleague in the district court. Upon examination, the record makes clear that defense counsel sufficiently articulated a link between Rudy's involvement in the pending state murder investigation and his testimony in the federal action. The conceded facts that Rudy was interrogated by state investigators soon after he was arrested, that he gave a statement about the murder of Curtis Rios and that he *might* have been charged with the murder—a serious offense that carries a severe punishment—could have been linked to Rudy's decision to cooperate with the Government in this action. *Cf. Lindh v. Murphy*, 124 F.3d 899, 901 (7th Cir. 1997) ("[The witness] may have believed that testimony helping the prosecution in this case, which achieved notoriety throughout Wisconsin, would aid his [unrelated, pending criminal] cause, if only because it was bound to come to the attention of the judge who presided in the prosecution against him."); *United States v. Anderson*, 881 F.2d 1128, 1139 (D.C. Cir. 1989) ("To require evidence of an actual cooperation agreement

between [the Government] and [the allegedly biased witness], as the district court in this case did, overlooks the inherent and independent relevance of the *mere fact* of a recently dismissed murder charge, a charge which hung over the witness' head like the sword of Damocles . . . ." (emphasis in original)). We believe the established facts were probative of Rudy's possible bias. He had been implicated in the murder, he had been subject to the investigation, he had not been charged and there was no indication that the investigation was closed.

The mere fact that Rudy denied the existence of an agreement not to prosecute him for the state murder in return for his testimony against the defendants does not end the matter. The defendants were entitled to meaningful cross-examination on the question of bias so that the jury could assess fully his testimony. As we see it, the district court's ruling placed counsel for the defendants in a predicament not unlike the situation facing counsel in *Davis*:

> We cannot accept the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to de-velop the issue of bias properly to the jury. While counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. *On the basis of the limited cross-examination*

> *that was permitted, the jury might well have thought*
> *that defense counsel was engaged in a speculative and*
> *baseless line of attack on the credibility of an apparently*
> *blameless witness*[25] or, as the prosecutor's objec-
> tion put it, a 'rehash' of prior cross-examination.
> On these facts it seems clear to us that to make
> any such inquiry effective, defense counsel should
> have been permitted to expose to the jury the
> facts from which jurors, as the sole triers of fact
> and credibility, could appropriately draw infer-
> ences relating to the reliability of the witness.
> Petitioner was thus denied the right of effective
> cross-examination which would be constitu-
> tional error of the first magnitude and no amount
> of showing of want of prejudice would cure it.

415 U.S. at 318 (emphasis, other than the one accompany-
ing note 25, in original; internal quotation marks omitted).

Rudy's alleged bias was more uncertain than the bias
alleged in *Van Arsdall*, and, perhaps, was even more
uncertain than the alleged bias in *Davis*. Nevertheless, it
was not so speculative as to make defense counsel's
attempt to demonstrate it fall outside the guarantee of
the Sixth Amendment.

There are, of course, limits to the Sixth Amendment
guarantee of the opportunity to question a witness
about his bias. As the Supreme Court has stated:

> "[T]he exposure of a witness' motivation in tes-
> tifying is a proper and important function of

---

[25] This emphasis added.

the constitutionally protected right of cross-examination." [*Davis*, 415 U.S. at 316-17]. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

. . . .

. . . We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." [*Davis*, 415 U.S. at 318].

*Van Arsdall*, 475 U.S. at 678-80 (citations modified; emphasis in original).

A bias theory may be so speculative that a court would be entitled to preclude its admission under Rule 403.[26] Here, however, although Rudy's bias was denied by the Government and Rudy himself, the defendants articulated a reasonable argument to the contrary. The timing, nature and status of the Maywood murder investigation was probative of bias and the defense had the right to explore it fully and allow the jury to draw its own conclusions.

That the defendants were permitted to examine other matters relating to Rudy's alleged bias, such as the written plea agreement and Rudy's prior convictions, does not resolve the Sixth Amendment violation. *Cf. Davis*, 415 U.S. at 318 ("We cannot accept the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury."). The alleged bias arising out of the Maywood murder investigation was a separate and independent area of bias,

---

[26] *See United States v. Given*, 164 F.3d 389, 392 (7th Cir. 1999) (finding no error in a district court's ruling precluding re-recross-examination about a witness's unrequited romantic interest in the defendant because the issue was unsubstantiated and had been unpursued by the defense); *United States v. Sinclair*, 109 F.3d 1527, 1537-38 (10th Cir. 1997) (concluding that the defendant's theory of witness bias lacked "factual support," was "highly doubtful," and, thus, fell within the district court's Rule 403 discretion to limit cross-examination).

which the defendants sufficiently had distinguished from the other areas of bias.

We must conclude that the questions that the defendants were not permitted to ask were directly relevant to the jury's assessment of Rudy's possible bias. Accordingly, the restriction of the defendants' cross-examination of Rudy violated their rights under the Sixth Amendment.

**5.**

We now examine whether the violations of Messrs. Bell's and Terrell's Sixth Amendment confrontation rights were harmless error.[27] Violations of the Sixth Amendment's Confrontation Clause are subject to harmless error review. *See Van Arsdall*, 475 U.S. at 684. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* "Whether an error is harmless beyond a reasonable doubt

---

[27] Mr. Martin does not join in this argument. *See* Martin/Bell Appellants' Br. 24 (contending only that Rudy's testimony was necessary to convict *Mr. Bell*). Even if he had, we would find that the wealth of evidence presented against Mr. Martin renders the Sixth Amendment violation harmless. For example, at least three high-ranking members of the Mafia Insanes network, Donnell Simmons, Johnny Moore and Patrick Bray, testified about the practice of paying Mr. Martin street taxes collected from the Mafia Insanes controlled drug spots.

depends upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence and the overall strength of the prosecution's case." *Smith*, 454 F.3d at 715.

Mr. Bell contends that Rudy's testimony was the only evidence the Government offered linking him to the overarching Mafia Insanes conspiracy, as organized primarily by Mr. Martin.[28] Mr. Bell concedes that evidence established that he was a ranking member of the Mafia Insanes street gang. However, he contends that "being a member of a gang is not the same as being a member of a drug conspiracy." Martin/Bell Appellants' Br. 25. For example, Mr. Bell argued to the jury that his payments of sizeable amounts of cash to Mr. Martin were personal loans among friends. Mr. Bell now contends that Rudy's testimony was the only evidence the Government offered establishing that those payments were street taxes collected from the drug spots controlled by the Mafia Insanes conspiracy.

The Government contends that Rudy's testimony was hardly necessary to establish that Mr. Bell joined the charged conspiracy. The Government notes that the jury heard Mr. Bell's post-arrest statement:

---

[28] *See* Martin/Bell Appellants' Br. 24-25 ("[A]lthough [Mr. Bell] was a drug dealer he was not a member of Mr. Martin's organization and never had been in a conspiracy *with Mr. Martin's organization* to distribute narcotics." (emphasis in original)).

I was affiliated with the Mafia Insane Vice Lords and I ran one drug spot on North Avenue in Chicago from 2000 until 2002 or 2003. I supervised other drug workers when I was running the drug spot on North Avenue. A Five Star Universal Elite is a high-ranking member of the Mafia Insane Vice Lords.

Trial Tr. at 157, Sept. 5, 2006.

Although Mr. Bell contends that this statement does not contain an admission that he paid a street tax to the king of the Mafia Insanes, other testimony directly addresses this point. Rudy's general testimony about the structure of the Mafia Insanes network, not at all specific to Mr. Bell's participation, was really of little or no consequence to Mr. Bell's conviction. The jury had substantial evidence from which to understand the network and to assess Mr. Bell's involvement in the charged conspiracy. The evidence overwhelmingly showed that Mr. Bell agreed with other members of the conspiracy to distribute narcotics. The violation of Mr. Bell's Sixth Amendment right to confront Rudy was harmless beyond a reasonable doubt.

Mr. Terrell also claims that he was a drug dealer, but not a member of the charged conspiracy. He contends that the evidence at trial showed that he was not a member of the Mafia Insanes gang, but rather another gang called the Cicero Insane Vice Lords. Mr. Terrell emphasizes that he did not pay street taxes to Mr. Martin. He concedes that Donnell Simmons told the jury how Mr. Terrell had supplied certain Mafia Insanes dealers

with drugs. However, Mr. Terrell contends that the Simmons testimony could not have been believed without corroboration from Rudy. He also contends that merely supplying drugs to the Mafia Insanes gang did not make him part of the charged conspiracy.

The Government points out that five witnesses testified about Mr. Terrell's involvement in the charged conspiracy and that the jury heard wiretap recordings of telephone calls between Mr. Terrell and other co-conspirators. It claims that these calls revealed that Mr. Simmons, Mr. Terrell and another co-conspirator, Mario Taylor, cooperated to avoid law enforcement detection of their narcotics distribution efforts. It points out that Christopher Clark, Mr. Terrell's confederate, testified that Mr. Terrell and Clark fronted large amounts of narcotics to Mr. Simmons, Mr. Taylor and other defendants charged in the conspiracy. The men used code words in their dealings to avoid law enforcement detection. Mr. Terrell personally knew that Mr. Simmons was a high-ranking member of the Mafia Insanes drug distribution network, and, thus, Mr. Terrell clearly knew or intended that his sales would further the overall narcotics distribution scheme.

After a thorough examination of the record, we are convinced that Rudy's testimony contributed little, if any, new information for the jury's consideration and that its corroborative value to the Government's overall effort to convict Mr. Terrell was, at best, minimal. We are convinced beyond a reasonable doubt that the Confrontation Clause error was harmless.

### C. Jury Instructions Challenge

**1.**

Mr. Terrell separately challenges the district court's refusal to give the jury a multiple conspiracies instruction. As we have noted earlier, "Mr. Terrell's defense theory was that although he may have dealt drugs personally, he was involved in an entirely different conspiracy than the conspiracy charged by the government in Count One of the Indictment." Terrell Appellant's Br. 5. The crux of Mr. Terrell's position is that, although he conspired to distribute narcotics with his associate, Christopher Clark, he never conspired with the larger conspiracy charged in the indictment. He contends that his sales to Mr. Simmons and Mr. Taylor reveal merely a buyer-seller relationship. During closing argument, Mr. Terrell's defense counsel emphasized the following facts in his attempt to show that Mr. Terrell had joined a conspiracy with Clark, but not with Mr. Simmons and the other Mafia Insanes co-conspirators: (1) that Mr. Terrell was not a member of the Mafia Insanes gang; (2) that Mr. Terrell did not pay street taxes to the Mafia Insanes; (3) that Mr. Terrell actually competed for customers with the Mafia Insanes; and (4) that Mr. Terrell's goal was exclusively to make money for himself.

Mr. Terrell's counsel proposed that the district court give a multiple conspiracy jury instruction modeled on the Sixth Circuit Pattern Jury Instructions 3.08 and 3.09. *See* Trial Tr. at 959, Jul. 18, 2007. The Government objected to the instructions on the ground that no evidence supported Mr. Terrell's theory of multiple

conspiracies. The district court noted that the pattern jury instructions referred to multiple defendants, while Mr. Terrell had been tried alone. The court also noted that Mr. Terrell had not modified the pattern jury instructions to reflect accurately his particular theory of multiple conspiracies. Mr. Terrell's counsel accordingly submitted a revised version of the proposed multiple conspiracies instructions.[29] Defense counsel then argued

---

[29] Mr. Terrell's revised proposed instruction 3.08 read as follows:

(1) The indictment charges that the defendants were all members of one single conspiracy to commit the crime of knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, in excess of 5 kilograms of mixtures containing cocaine and in excess of 50 grams of mixtures containing cocaine base (in the form of "crack" cocaine), Schedule II Narcotic Drug Substances; and in excess of 1 kilogram of mixtures containing heroin, and marijuana, Schedule I controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1).

(2) The defendant has argued that there were really separate conspiracies, one between Jerome Terrell and Christopher Clark to commit the crime of possession with intent to distribute cocaine and cocaine base and another one between the Mafia Insane Vice Lords to commit the crime of Possession with intent to distribute cocaine, cocaine base, heroin and marijuana.

(3) To convict any one of the defendant [sic] of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant

(continued...)

that the instructions were necessary because Mr. Terrell was part of a smaller conspiracy than the one charged in the indictment. *See* Trial Tr. at 972, Jul. 19, 2007 ("What has the government shown was the agreement? Was it this overarching agreement between [Mr. Terrell] and the conspiracy, which is what is necessary, of course, or was there a smaller conspiracy going on where there was agreement perhaps with Christopher Clark and Donnell Simmons?").

The district court indicated confusion about whether Mr. Terrell was arguing that he was innocent of joining the charged conspiracy or whether he admitted to joining the conspiracy, but only a small part of it. The Government also reiterated its objections to the pro-

---

[29] (...continued)

> was a member of the conspiracy charged in the indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to convict.

> (4) But proof that defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy charged in the indictment.

*See* R.1875 at 2-3. Mr. Terrell's proposed instruction 3.09 was materially identical to the Sixth Circuit pattern jury instruction 3.09. *Id.* at 3-4.

posed instructions as unsupported by the evidence. *Id.* at 974. A colloquy followed between the court and counsel:

THE COURT:   Let me ask another question.

If Mr. Terrell conspired with Mr. Clark to commit the crime of possession with intent to distribute, which is what the defendant is effectively conceding in paragraph 2, and Mr. Clark was a part of the conspiracy that's charged in the indictment, and some of Mr. Terrell's activities with Mr. Clark were also part of Mr. Clark's activities with respect to the conspiracy as a whole, why isn't that sufficient to establish that Mr. Terrell is a member of the conspiracy?

[THE GOVERNMENT]:  We think it is.

THE COURT:  Remember, one of the principles that is just well recognized is that the defendant doesn't have to know all the members of the conspiracy. He doesn't have to know what all the other ones were up to or when and how they were doing it as long as he agreed with one or more other members to participate in the alleged wrongdoing. It seems to me that that's what the charge establishes here.

[DEFENSE COUNSEL]: They have to further the overall cause, your Honor. They have to further the overall cause of the conspiracy. I think that's the bottom line in any conspiracy trial. One, that there was a conspiracy; and, number two, that this person joined it with the intent of furthering

that conspiracy. So you need an agreement, and that's what the courts have been saying is that you have to look at the agreement.

Was he in agreement with this entire conspiracy, or was he in agreement with Christopher Clark?

Now, if he was in agreement with Christopher Clark, what this instruction is telling the jury is that, look, that's not enough. He just has an agreement with Christopher Clark. It doesn't mean he has an agreement with everybody else in this conspiracy.

THE COURT: All right. Here is an instruction to which there was no objection: "The government need not prove that the defendant knew all of the coconspirators or knew each detail of the conspiracy or that the defendant played more than a minor role. The defendant need not have participated in all of the events of the charged conspiracy to be a member of that conspiracy."

[THE GOVERNMENT]: Judge, if I can just say one thing.

I think you have hit the nail on the head. If the government proves that the two individuals, Mr. Clark and Mr. Terrell, who are both mentioned in paragraph 1 of the indictment, agreed with each other, I think that's the end of the story. I think that based on that, this instruction is a misstatement of the law.

We think we have proved more than that minimum agreement between Mr. Terrell and Mr. Clark. We think we have shown several agreements. This is a very large conspiracy by numerous factions of the Vice Lords, and there is a great deal of evidence in this case that there were agreements beyond the Clark/Terrell agreement.

But the Clark/Terrell agreement does the trick as far as the government is concerned as far as just the existence of the conspiracy. It may not show or it may be more doubtful whether it shows the quantities and all the things that I think we can prove with all the other evidence we have presented. But as far as establishing a conspiracy, I think this instruction that's offered, this Sixth Circuit instruction, confuses the issue.

THE COURT: I am going to sustain the government's objection to the multiple conspiracies instruction.

*Id.* at 975-78.

Mr. Terrell next moved for the inclusion of the Seventh Circuit pattern buyer-seller relationship instruction, which the district court agreed was appropriate. *Id.* at 980-81.

The jury convicted Mr. Terrell on the conspiracy count, among others. In his Rule 33 post-trial motion, Mr. Terrell contended that the district court had erred by refusing his proposed multiple conspiracies instructions. The district court denied the motion, explaining:

Terrell effectively concedes that the evidence was sufficient to establish that he was guilty of conspiring with others to distribute narcotics: The government presented the testimony of Donnell Simmons, the supervisor of a "drug spot" to whom Terrell supplied quantities of powder and crack cocaine. Christopher Clark, who served as a courier for the drugs that Terrell supplied and cash that Simmons returned, also testified. The evidence included recorded conversations in which Clark told Simmons that he was waiting for a cocaine supply from Terrell, as well as a call in which Simmons advised Terrell about a device that would enable Terrell to determine if "somebody's wearing a wire," and another one in which Simmons warned Terrell about police surveillance over Terrell's own drug spot. Terrell and his courier, Clark, also interacted with Mario Taylor and with three drug sellers working under Mario Taylor's supervision, using shorthand expressions in a manner that amply reflects Terrell, Clark, and Mario Taylor's shared understanding of the practice of providing or obtaining particular quantities of cocaine for cash. At Defendant's request, the court did give the jury a "buyer-seller" instruction. He now contends that, had the court also given a "multiple conspiracies" instruction, the jury would not have held him accountable for such a large quantity of drugs. But this argument ignores the evidence that Terrell himself was involved in traf-

ficking prodigiously large quantities of cocaine; that he had a standardized way of doing business with others over a substantial time period; and that he maintained a financial interest in the drug business conducted by others.

R.2130. Mr. Terrell appeals the district court's ruling.

**2.**

Mr. Terrell contends that the district court denied his right to a fair trial by refusing the proposed multiple conspiracies instruction. He argues that the trial evidence showed that "[t]he goal of the conspiracy charged by the government in Count One was the financial betterment of Mr. Martin's drug operation," but that "[t]he goal of [the conspiracy Mr. Terrell admitted to participating in with Mr. Clark] was the betterment of Mr. Terrell's financial interests and the interests of those working with him." Terrell Appellant's Br. 10; *see also* Terrell Reply Br. 4. He emphasizes that his proposed instructions "did not instruct the jury that it should acquit Mr. Terrell if he conspired with a subset of the charged conspiracy," and he concedes that such an instruction would have been erroneous as a matter of law. Terrell Reply Br. 1. He contends that sufficient evidence supported his theory of multiple conspiracies. *See* Terrell Appellant's Br. at 10-11 (suggesting that he was not a member of the Mafia Insanes street gang, that he did not pay street taxes to the leadership of that gang and that he was in a conspiracy that actually competed with the Mafia Insanes). He admits that the evidence showed that he sold drugs

to members of the charged conspiracy, but maintains that those sales were not in furtherance of the conspiracy, but rather were typical of a buyer-seller relationship. *Id.*

**3.**

We generally review for abuse of discretion a district court's refusal to provide a requested jury instruction. *See United States v. Campos*, 541 F.3d 735, 744 (7th Cir. 2008). However, "[w]e review the district court's refusal to instruct the jury on a theory of defense *de novo.*" *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005). "A defendant is entitled to an instruction on his theory of defense only if '(1) the instruction provides a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of the defense is not part of the government's charge; and (4) the failure to include the instruction would deprive the defendant of a fair trial.' " *Campos*, 541 F.3d at 744 (quoting *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007)). "If the instructions treated the conspiracy issue fairly and adequately, we will not disturb them." *United States v. Severson*, 3 F.3d 1005, 1011 (7th Cir. 1993).

To be guilty of conspiring, one must agree with another person, with the necessary criminal intent, to achieve a certain criminal objective. *See United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999). "The crime of conspiracy focuses on agreements, not groups." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). Thus, the Government must prove that "the defendant joined the agreement alleged, not the group." *Id.* "The

agreement is all-important in conspiracy, for one must look to the nature of the agreement to decide several critical issues, such as whether the requisite mental state is also present, whether the requisite plurality is present, and whether there is more than one conspiracy. As courts have so often said, the agreement is the essence or gist of the crime of conspiracy." 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(a) (2d ed. 2010) (internal quotation marks and footnotes omitted); *see also United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1969) ("In essence, the question is what is the nature of the agreement."). "Even when it is clear that every defendant is a conspirator, it may be extremely important to determine precisely what the object dimension and party dimension of the agreement are, for that in turn will decide the critical question of whether more than one conspiracy exists." Lafave, *Substantive Criminal Law*, *supra*, § 12.3(b). "Multiple conspiracies exist when there are separate agreements to effectuate distinct purposes." *Thornton*, 197 F.3d at 254.

Here, Mr. Terrell was tried alone.[30] The jury instructions

---

[30] Determining whether multiple conspiracies existed is particularly important when several defendants are tried together. If the defendants joined multiple and distinct conspiracies, trying the defendants jointly risks allowing the jury to transfer "guilt from one to another across the line separating [the] conspiracies, subconsciously or otherwise." *Kotteakos v. United States*, 328 U.S. 750, 774 (1946). In such cases, a multiple conspiracies instruction may be warranted. *Id.* at 769-72; *see also United States v. Schmucker-Bula*, 609 F.2d 399, 403 (7th Cir.

(continued...)

issued by the district court explained adequately that Mr. Terrell should be acquitted if the evidence failed

---

[30] (...continued)

1980) ("It is true, as the defendant argues, that courts should be vigilant against the transfer of guilt 'from one to another across the line separating conspiracies . . . .' *Kotteakos v. United States*, 328 U.S. 750, 774 (1946). It is also true, however, that the existence of multiple conspiracies is a question of fact, and the role of the court is generally limited to instructing the jury when the possibility of a variance between the evidence and the conspiracy charged in the indictment arises. *See United States v. Papia*, 560 F.2d 827, 838 (7th Cir. 1977); *United States v. Varelli*, 407 F.2d 735, 746 (7th Cir. 1969). The trial court properly instructed the jury that proof of several conspiracies is insufficient to permit conviction unless one of the conspiracies proved is the one charged in the indictment." (parallel citations omitted)).

This problem usually is not present when a defendant is tried alone. In such a case, a multiple conspiracies instruction well may be unnecessary. *See United States v. Anguiano*, 873 F.2d 1314, 1318 (9th Cir. 1989) ("[A] multiple conspiracies instruction is generally designed for trials involving multiple defendants engaged in multiple conspiracies, not for trials of lone defendants who are worried that the jury may not agree upon the same set of facts."); *see also United States v. Richardson*, 532 F.3d 1279, 1290-91 (11th Cir. 2008); *United States v. Corey*, 566 F.2d 429, 431 n.3 (2d Cir. 1977). Therefore, as long as the district court instructs the jury on the nature of the conspiracy charge, emphasizing that the Government must prove that the defendant intentionally agreed to advance the aim of the conspiracy, there is usually no need for a multiple conspiracies instruction when a defendant is tried alone.

to establish the existence of the charged conspiracy or that Mr. Terrell did not agree to join it. Furthermore, the evidence in this case did not warrant the issuance of a multiple conspiracies instruction. A multiple conspiracies instruction is unnecessary when the evidence reveals the existence of only one conspiracy. *See United States v. Longstreet*, 567 F.3d 911, 921 (7th Cir. 2009); *Jenkins*, 419 F.3d at 618; *see also Thornton*, 197 F.3d at 255; *United States v. Mims*, 92 F.3d 461, 467-68 (7th Cir.), *reh'g granted on other grounds* 101 F.3d 494 (7th Cir. 1996); *United States v. Shorter*, 54 F.3d 1248, 1256 (7th Cir. 1995). The nonexistence of multiple conspiracies may be so obvious that the jury need not be instructed on that issue. *See Severson*, 3 F.3d at 1010.

Here, upon examination of the record, we believe the evidence adduced during Mr. Terrell's trial revealed only one, interdependent conspiracy to distribute narcotics. We emphasize that the purpose of the conspiracy charged in Count One of the indictment was simply to distribute narcotics. Mr. Terrell fails to articulate a different or distinct purpose for the conspiracy he admits to have joined with Christopher Clark. Mr. Terrell's characterization of an alternative conspiracy, consisting of an agreement with Clark to further Mr. Terrell's financial interests, as opposed to the financial interests of the Mafia Insanes gang, is nothing more than a description of a subset of the conspiracy charged in the indictment. "One can join a conspiracy to make money, even though others join it for different reasons. The question is whether the parties have agreed to advance a common goal." *United States*

*v. Duff*, 76 F.3d 122, 127 (7th Cir. 1996).[31] Although we have trouble conceiving of a reason motivating the co-conspirators in this case to join the conspiracy, other than to advance their individual financial interests, that issue is beside the point; each co-conspirator's financial motivation for joining the conspiracy is essentially irrelevant.

What is clear, and of paramount relevance, is that each co-conspirator agreed to advance the conspiracy's goal of distributing narcotics. The evidence revealed that Mr. Terrell fronted wholesale quantities of narcotics to the members of the conspiracy and took steps, such as cooperating with Mr. Simmons to avoid police detection, to further the conspiracy's objectives. Because Mr. Terrell and Christopher Clark were both charged as co-conspirators in Count One of the indictment, Mr. Terrell's concession that he conspired to distribute narcotics with Clark, along with the evidence that Mr. Terrell fronted narcotics to other co-conspirators with knowledge that the narcotics would be distributed,

---

[31] The facts that Mr. Terrell did not pay street taxes to and was not a member of the Mafia Insanes does not establish the existence of multiple conspiracies. The crucial fact is that all the co-conspirators agreed to distribute narcotics in the west side of Chicago during the relevant time period.

Of course, isolated instances of cooperation between competing drug distribution networks may not support the existence of one, overarching conspiracy. *Cf. United States v. Townsend*, 924 F.2d 1385, 1393 (7th Cir. 1991) (discussing *United States v. Fiorito*, 499 F.2d 106, 109 (7th Cir. 1974)).

essentially precludes a theory of multiple conspiracies. The Government "may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged, so long as the subset is also illegal." *United States v. Wilson*, 134 F.3d 855, 865 (7th Cir. 1998) (internal quotation marks and citation omitted); *see also Campos*, 541 F.3d at 745; *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000). Although there was some evidence that Mr. Terrell competed with his co-conspirators for customers from time-to-time, there was other evidence that he frequently co-operated with members of the conspiracy and agreed to further the conspiracy's objective. The jury rejected Mr. Terrell's buyer-seller theory and based its verdict on the substantial evidence showing that Mr. Terrell agreed to join the conspiracy to distribute narcotics. *Cf. United States v. Sir Kue Chin*, 534 F.2d 1032, 1035 (2d Cir. 1976) ("The essence of the crime is an agreement, and there is no more reason to say that a supplier of narcotics is necessarily engaged in two conspiracies because he has two sources of supply than there would be because he had two purchasers.").

Finally, we note that Mr. Terrell's buyer-seller theory was valid and an essential component of his defense. That theory depended on a characterization of the evidence showing that Mr. Terrell never agreed to join the conspiracy in the first place. The district court's instructions on that subject were satisfactory.

Mr. Terrell was not entitled to the multiple conspiracies instruction because the theory of defense was not sup-

ported by the evidence. The theory of the defense was essentially a subset of the Government's charge and the failure to include the instruction did not deprive Mr. Terrell of a fair trial. The instruction given by the district court put the case before the jury in a straight-forward and comprehensive manner.

## D.

### Sentencing Enhancement Challenge

Mr. Bell also challenges the inclusion of the U.S.S.G. § 2D1.1(b)(1) enhancement in the district court's guide-lines calculation. That enhancement applies when the defendant possessed a dangerous weapon during the course of the commission of the drug offense.

> The government bears the burden of first proving by a preponderance of the evidence that the defendant possessed the weapon. The defendant need not have actual possession of the weapon; constructive possession is sufficient. If the government carries its burden, then the defendant must show that it was clearly improbable that the weapon was connected to the drug offense.

*United States v. Are*, 590 F.3d 499, 526 (7th Cir. 2009) (internal quotation marks and citations omitted). Co-conspirators' foreseeable possession of dangerous weapons may be attributable to a defendant so as to trigger application of the enhancement. *See United States v. Emerson*, 501 F.3d 804, 815 (7th Cir. 2007). We review factual findings under U.S.S.G. § 2D1.1(b)(1) for clear error. *See Are*, 590 F.3d at 526.

During Mr. Bell's sentencing hearing, the Government argued for application of the enhancement because firearms ammunition and drugs were recovered from Mr. Bell's residence at the time of his arrest and because, in telephone calls between Mr. Bell and co-conspirators recorded during the course of the conspiracy, Mr. Bell asked to borrow a "thumper" for protection and bragged about carrying a "thumper" to avoid capture by the police. *See* R.1902, Ex. A. A co-conspirator testified that a "thumper" referred to a pistol. *See* Trial Tr. at 475-76, Sept. 6, 2006. The district court ruled that the Government had met its burden because the circumstantial evidence supported a finding that Mr. Bell had possessed a dangerous weapon during the course of the conspiracy. The district court also noted that countless pieces of evidence adduced at trial supported the inference that co-conspirators' possession of dangerous weapons was foreseeable. The district court discounted co-conspirator testimony to the effect that he never gave Mr. Bell a firearm.

Mr. Bell contends that the district court's factual finding was erroneous. He submits that the district court should have believed the co-conspirator's testimony and that the recorded telephone calls were too ambiguous to have supported the finding. We disagree. The finding clearly was supported by the evidence. The district court weighed appropriately the evidence and explained sufficiently its finding. The Government met its burden and the enhancement was applied correctly in Mr. Bell's guidelines calculation.

### E.

### Other Sentencing Challenges

Messrs. Martin, Bell, Taylor and Braboy raise a host of additional challenges to their sentences. Messrs. Taylor and Braboy contend that the district court erred by failing to consider and articulate its consideration of certain 18 U.S.C. § 3553(a) factors when it imposed their sentences. We review sentences for reasonableness under an abuse-of-discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Sentences within an appropriately calculated guidelines range are presumptively reasonable. *Id.*; *see also United States v. Wallace*, 531 F.3d 504, 507 (7th Cir. 2008). When considering the 18 U.S.C. § 3553(a) factors, the district court need not "write a comprehensive essay applying the full panoply of penological theories and considerations, which is to say everything invoked or evoked by section 3553(a)." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005); *see also United States v. Jumah*, 599 F.3d 799, 813-14 (7th Cir. 2010); *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006).

Messrs. Taylor and Braboy contend that the district court failed to take into account their history and characteristics, specifically their troubled childhoods and their ages at the time of sentencing. However, during the sentencing hearing, the district court stated that it had considered Mr. Taylor's "entire record" and noted that Mr. Taylor had "made a significant change in [his] life," reflecting that the district court had compared Mr. Taylor's lifestyle and personal characteristics exhib-

ited before his arrest with his post-arrest conduct. Tr. at 26, Dec. 10, 2007. During Mr. Braboy's sentencing hearing, the district court referenced several specific arguments asserted in his sentencing memorandum, including Mr. Braboy's newfound maturity, and stated that "I know that given the family background, . . . the temptation to just get involved in criminal conduct is enormous." Tr. at 41-42, Dec. 4, 2007. These statements reveal that the district court gave due consideration to the § 3553(a) factors raised by the defendants. The defendants concede that the district court appropriately calculated their guidelines ranges. The within-guidelines sentences that the district court imposed were reasonable.

Next, Messrs. Martin and Bell contend that the district court erred by not considering whether the sentencing disparity between crack and powder cocaine yields a sentence greater than necessary to achieve 18 U.S.C. § 3553(a)'s purpose. *Kimbrough v. United States*, 552 U.S. 85 (2007). The Government agrees that a limited remand to consider this issue is appropriate. Accordingly, we order a limited remand so that the district court may follow the procedures described in *United States v. Taylor*, 520 F.3d 746, 748-49 (7th Cir. 2008), to address the effect of both the 2007 Amendment to U.S.S.G. § 2D1.1 and *Kimbrough v. United States*, 552 U.S. 85 (2007), on Messrs. Martin's and Bell's sentences. After resolving any motion for a reduced sentence under 18 U.S.C. § 3582(c)(2) based on the Amendment, the court should indicate whether it is inclined to reduce further

Messrs. Martin's or Bell's sentences under *Kimbrough*.[32] Additionally, although Messrs. Braboy and Taylor did not raise the *Kimbrough* issue in their appellate arguments, we note that they were sentenced prior to the issuance of *Kimbrough*, and, thus, are entitled to a remand pursuant to the procedures we described in *United States v. Taylor*, 520 F.3d 746, 748-49 (7th Cir. 2008). Mr. Terrell was sentenced after the enactment of the 2007 Amendment and *Kimbrough*, and, thus, he could have raised those issues before the district court if the court had not addressed adequately those issues. Accordingly, the record does not support a remand for resentencing for Mr. Terrell.

## Conclusion

For the foregoing reasons, we affirm the district court's pretrial and trial rulings. We order limited remands for reconsideration of Messrs. Martin's, Bell's, Braboy's and Taylor's sentences.

AFFIRMED in part;
REMANDED in part

---

[32] We already have severed Mr. Simmons's appeal, No. 07-2039 and Jermaine Banks's appeal, No. 07-1444, and remanded with identical instructions on this issue.

---