In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2370

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES TANNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:04-CR-00080-RL-PRC-1—**Rudy Lozano**, *Judge.*

ARGUED SEPTEMBER 8, 2010—DECIDED DECEMBER 17, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant Charles Tanner abandoned a promising career in boxing to become a major player in a conspiracy to distribute large amounts of cocaine. Like many other drug dealers, Tanner was caught when his co-conspirators turned on him in an attempt to reduce their own prison time. After a jury convicted him for his role in the conspiracy, Tanner was sentenced to life in prison, in large part because of the

significant amount of cocaine he helped distribute. On appeal Tanner argues that the prosecutor violated his Fifth Amendment privilege against self-incrimination by pointing out in closing arguments defense counsel's failure to rebut the government's case. Tanner also argues that the district court improperly admitted certain evidence against him and instructed the jury improperly. Tanner further asserts that the district court miscalculated his advisory sentencing guideline range and that life imprisonment is unreasonable.

None of Tanner's arguments warrant reversal of his conviction or his sentence. A number of individuals other than Tanner could have been in a position to rebut the government's case, so we find no error in the prosecutor's closing argument. Except for certain testimony regarding Tanner's possession of a firearm on one occasion, all of the complained-of evidence was clearly admissible. The one exception was harmless. As for the jury instructions, the district court's only error was in giving an "ostrich" instruction lacking sufficient factual support in the trial record. That error was also harmless. The district court properly calculated Tanner's sentence, and a life sentence was reasonable under these circumstances. Accordingly, we affirm.

I. *Factual Background*

During an investigation of two crack houses in Gary, Indiana, a law enforcement task force learned that a man named Warren Moore was a mid-level dealer of crack

cocaine. Moore turned out to be a relatively minor player in a larger drug distribution ring. Law enforcement arrested him on April 20, 2004 and convinced him to become a government informant. As an informant, Moore made a controlled purchase of crack cocaine from Erbey Solis on August 31, 2004, after which Solis was arrested, and he in turn also agreed to become a government informant.

The investigation into Moore revealed that appellant Tanner was a high-level drug dealer, and Solis agreed to help the government investigate Tanner's drug dealing. At the direction of law enforcement, Solis called Tanner and arranged to sell Tanner 15 kilograms of cocaine. The drug deal took place in the parking lot of a drugstore in Gary, Indiana on September 1, 2004. Because it would be unwise (for obvious reasons) to bring such a large amount of real cocaine to the deal, law enforcement provided Solis with 15 kilograms of simulated cocaine. Tanner was arrested when he took possession of the simulated cocaine from Solis.

Once in custody, Tanner quickly provided a full confession implicating himself as a high-level cocaine dealer. In that confession, Tanner identified his main supplier of cocaine, from whom he claimed to have purchased between 10 and 15 kilograms of cocaine on previous occasions. Tanner also named another supplier from whom he had purchased large amounts—between 5 and 10 kilograms at a time. Tanner further admitted that he was attempting to purchase 15 kilograms of cocaine from Solis at the time he was arrested, and he

said that he had purchased somewhere between 15 and 25 kilograms of cocaine from Solis in the past.

Tanner was indicted on charges of conspiracy to possess cocaine with intent to distribute, and with attempted possession of 5 kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. Tanner was tried on these charges alongside alleged co-conspirator Lance Foster. Both Moore and Solis testified to Tanner's participation in a multi-state conspiracy to distribute large quantities of crack cocaine. Solis also testified as to his involvement in the sham drug sale that led to Tanner's arrest, and the prosecution played for the jury recordings of Tanner's and Solis's phone calls planning that sale. Particularly damning was the testimony of the two FBI agents who took Tanner's confession after his arrest. Those agents testified that Tanner had admitted that he was part of a large conspiracy to distribute drugs and that he was attempting to purchase cocaine from Solis when he was arrested. Tanner did not testify. He also did not seriously challenge the government's overwhelming evidence of his guilt. Tanner chose instead to call a number of character witnesses. The jury convicted Tanner on both counts against him, and the district court sentenced Tanner to life imprisonment.

II. *Indirect Comments on Right to Remain Silent*

Tanner's primary argument on appeal is that the district court should have declared a mistrial *sua sponte*

because the prosecution's closing arguments infringed his Fifth Amendment right to remain silent. We review such allegations of prosecutorial misconduct not in a vacuum, but in the larger context of the parties' closing arguments and the trial itself. See *United States v. Holt*, 817 F.2d 1264, 1275 (7th Cir. 1987), quoting *United States v. Buchbinder*, 796 F.2d 910 (7th Cir. 1986). Our analysis of Tanner's claim starts with the specific parts of the defendant's closing argument that the prosecutor was attempting to rebut.

During Tanner's closing argument, defense counsel stated:

> I put witnesses on the stand, and I asked you to believe them beyond a reasonable doubt, even though I had no burden at all. No, I asked you just to believe them. Believe them a little bit. What difference does it make? [Tanner's] defense is unrebutted. The government had the right to bring in witnesses to say he had a horrible reputation for being a law abiding citizen. Did they? Not one single one.

> I rested [Tanner's] defense. They stood up and said, we rest in rebuttal. There was no rebuttal. The defense is unrebutted.

After arguing that the government had failed to rebut Tanner's character witnesses, Tanner's counsel concluded: "Where . . . is the rebuttal of the defense? Where are the witnesses that say that [Moore] is a truthful person? Where is the witness that says [Tanner] is an untruthful person? [The prosecution] had the right of rebuttal, [but] didn't use it."

Responding in his rebuttal argument, the prosecutor
stated:

> Defense counsel . . . got up and talked about what is
> unrebutted. So [it was] unrebutted he was a good
> boxer. This isn't about boxing. . . . It's unrebutted that
> he's a good character. Look at the evidence, we're
> not talking character witnesses. This isn't I like
> this guy, I don't like that guy. This guy's got a good
> reputation, this guy doesn't. We try this case, ladies
> and gentlemen, on facts.
>
> So if defense counsel wants to get up and say what's
> unrebutted, I'll tell you what's unrebutted. It's unre-
> butted, defense counsel didn't say a single thing
> about it, it's unrebutted that his client . . . was there to
> pick [the 15 kilograms of cocaine] up. It's unrebutted
> that he did pick that up on this date. It's unrebutted
> that defense counsel didn't say a single word about
> it, that it's his client on video . . . and that he thinks
> it's 15 kilos of cocaine. That, ladies and gentlemen,
> is unrebutted. Defense counsel didn't say a single
> word that this isn't my guy.

At this point, Tanner's counsel voiced his belief that
these comments came "dangerously close to a certain
area of law," but he did not object or state a specific legal
basis for an objection. Absent more specific complaints
from defense counsel, the court reminded the jury that
Tanner "does not have to prove anything." Tanner's
counsel voiced his disapproval of this statement but,
once again, failed to actually object. Absent any objec-
tion, the prosecution continued:

Defendant does not have to prove anything . . . . But defense counsel gave you a closing argument in which he talks about what was unrebutted. It is unrebutted that is this guy in the video. Now I want you to watch it. It's unrebutted that he hasn't said a single word about it. That . . . Tanner thought that was cocaine. It's unrebutted . . . he thought this was directly cocaine. It's unrebutted that that was his guy right there trying to get 15 kilos of cocaine.

Those phone calls . . . setting up the deal. Those are unrebutted. Defense counsel has no word of doing anything, he doesn't have to say a single word, but you have not heard a single thing which would lead you to believe that that wasn't his guy . . . on the phone.

Tanner's counsel finally objected at this point and, at a side-bar, argued that the prosecution "came so close to [saying that] the defendant did not testify." The court overruled the objection, and the prosecutor continued:

You have not heard a single thing from anyone to suggest that those calls weren't [Tanner], you never heard a single peep of evidence. That's not [Tanner] setting up that deal. It's unrebutted that when he's setting up that deal, he's trying to get 15 kilos of cocaine to distribute to his brothers. That is unrebutted.

Ladies and gentlemen, perhaps the most important thing that is unrebutted that you've heard nothing in defense closing argument about is the defendant's own confession. It's unrebutted that [Tanner] chose

on his own to meet with [two FBI agents]. Those two FBI special agents, it's unrebutted, sat downstairs while [the] defendant poured out his heart to them, and said I'm doing this for my brothers. . . . It's unrebutted that he confessed like that to a major narcotics conspiracy of over five kilos. . . . .

It's unrebutted that he tried to give up . . . a boxer that supplied him. It's unrebutted that he talked about [another of his suppliers].

Tanner's counsel objected again, but that objection was overruled. The prosecution concluded by noting, "It's unrebutted that [Tanner] confessed that he was getting drugs from [one of his suppliers]. It's unrebutted . . . that he in his own words confessed to this entire conspiracy to not one, but two FBI agents."

Did these comments require a mistrial? As a general matter, "a mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial." *United States v. Collins*, 604 F.3d 481, 489 (7th Cir. 2010). A prosecutor's alleged misconduct during closing arguments requires a mistrial only if (1) the conduct was actually inappropriate; and (2) in light of the entire record, the inappropriate conduct deprived the defendant of a fair trial. *United States v. Cheska*, 202 F.3d 947, 950 (7th Cir. 2000). We typically review a district court's refusal to declare a mistrial for an abuse of discretion. *United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007), citing *United States v. Canino*, 949 F.2d 928, 937 (7th

Cir. 1991). Here, however, Tanner's counsel (eventually) objected to the prosecutor's comments but never requested a mistrial, so our review is for plain error. *United States v. Harris*, 325 F.3d 865, 871 (7th Cir. 2003).[1] On review for plain error, a convicted defendant has the burden to show that (1) the error complained of actually occurred; (2) the error was clear or obvious; (3) the error affected his substantial rights (*i.e.*, he probably would not have been convicted absent the error); and (4) the error seriously impugned the judicial proceeding's fairness, integrity, or public reputation. *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010).

As a result, Tanner must show not only that the district court erred by failing to declare a mistrial, but that it was clear and obvious that a mistrial was necessary. In other words, Tanner must convince us that it should have been obvious to the district court both that an error occurred *and* that the error deprived him of a fair trial. Cf. *Cheska*, 202 F.3d at 950. Even then, reversal is appropriate only if he can show that the remarks probably changed the outcome of the proceedings. *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003), quoting *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003).

---

[1] Otherwise, we would blur the lines between an objection, which brings a perceived error to the court's attention, and a request for a mistrial, which indicates not only that an error may have occurred but that the defendant believes that error to be so severe as to require the impanelment of a new jury for a new trial.

Here, the prosecutor never commented directly on Tanner's exercise of his right to remain silent. Cf. *Griffin v. California*, 380 U.S. 609, 614 (1965) (forbidding "comment on the refusal to testify"). Absent such direct comment, "[t]he right against self-incrimination is violated only when '1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on the defendant's silence.'" *Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir. 1995), quoting *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir. 1994).

Nothing in the transcript of closing arguments indicates a manifest (*i.e.*, obvious or apparent) intent to refer to Tanner's silence. As ill-advised as his comments may have been, see *United States v. Butler*, 71 F.3d 243, 255 (7th Cir. 1995) (noting that "we always urge prosecutors to be cautious in making this type of statement"), the prosecutor appears to have intended only to respond to Tanner's counsel's closing argument that none of his character witnesses had been rebutted. In fact, the prosecutor explicitly said a number of times that Tanner's *counsel*—not Tanner himself—had not rebutted any of the government's evidence in his closing. See *United States v. Mietus*, 237 F.3d 866, 872 (7th Cir. 2001) (finding no error in part because prosecutor's statements "merely referred to what the defendants, through their lawyers . . . had argued during the trial").

It is a closer issue whether the jury would have "naturally and necessarily" understood the prosecutor's state-

ments as comments on Tanner's failure to testify. In the past, we have applied this test strictly, even literally: "A prosecutor's comment that the government's evidence is . . . unrebutted will violate [the Fifth Amendment] if *the only person* who could have rebutted the evidence was the defendant." *Id.* at 871 (emphasis added); see also *Williams v. Lane*, 826 F.2d 654, 665-66 (7th Cir. 1987) (finding error where defendant was "the only other possible defense witness who had failed to testify"); *United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987) ("We have taken *Griffin* to forbid comment on the defendant's failure to call witnesses, when the only potential witness was the defendant himself."). After all, a comment does not necessarily implicate a defendant's silence (and thereby penalize him for refusing to testify) if another witness could rebut the prosecution's case. See *United States v. Buege*, 578 F.2d 187, 188 (7th Cir. 1978) ("[W]hen a prosecutor refers to testimony as uncontradicted where the defendant has elected not to testify and when he is the only person able to dispute the testimony, such reference necessarily focuses the jury's attention on the defendant's failure to testify."), citing *United States v. Handman*, 447 F.2d 853, 855 (7th Cir. 1971). A speculative possibility that some third party could have testified for the defense is not enough, however. See *Freeman v. Lane*, 962 F.2d 1252, 1260 (7th Cir. 1992) ("Our cases have recognized that a prosecutor may not comment concerning the uncontradicted nature of the evidence when 'it is highly unlikely that anyone other than the defendant could rebut the evidence.' "), quoting *United States v. DiCaro*, 852 F.2d 259,

263 (7th Cir. 1988); *Buege*, 578 F.2d at 188-89 (finding error where only possible witness other than defendant did not even hear the statements he could supposedly contradict); *Handman*, 447 F.2d at 855 (reversing where nothing in record showed that anyone other than the defendant could have "challenged or contradicted" the testimony against him).

Under this demanding standard, we conclude that the jury would not necessarily have believed that the prosecutor was commenting on Tanner's failure to testify. Tanner was accused of having sold drugs not on his own, but as part of a large conspiracy. The possibility that even one of his alleged co-conspirators might have testified on his behalf is enough to dispel any constitutional concerns. See *Mietus*, 237 F.3d at 872 ("[W]here an accomplice could have provided testimony to rebut a part of the government's case, the prosecutor's statement that that evidence was unrebutted [will] not be taken as an impermissible comment on the defendant's silence."); *United States v. Aldaco*, 201 F.3d 979, 988 (7th Cir. 2000) (finding no error where defendant's three accomplices were available to rebut government witness's allegations); *Butler*, 71 F.3d at 255 (affirming because other gang members were present when defendant was arrested). A jury need not speculate about the possibility of third-party testimony on a defendant's behalf when, as here, the defendant is accused of conspiring with a large number of people, any of whom could have testified in his defense and rebutted the government's evidence. Cf. *United States ex rel.*

*Adkins v. Greer*, 791 F.2d 590, 598 (7th Cir. 1986) (finding no error where it was "not hard to imagine" that others could know of the defendant's illegal acts). Furthermore, Tanner's girlfriend was with him when he was arrested and, at the very least, could have testified on Tanner's behalf regarding the events leading to his arrest. See *United States v. McClellan*, 165 F.3d 535, 548 (7th Cir. 1999) (finding no error because defendant's girlfriend, who was with defendant at time of his arrest, could have testified). Of course it is possible, even likely, that neither Tanner's co-conspirators nor his girlfriend were actually willing and able to testify on Tanner's behalf, but it matters for our analysis only whether it is particularly likely that "the defendant was the only person who *could* rebut the evidence" referred to by the prosecution in its closing. *Adkins*, 791 F.2d at 598 (emphasis in original). On this record, a number of individuals other than Tanner could have rebutted the government's case, if in fact there had been a factual basis for rebutting it.

This analysis holds true despite the fact that the prosecutor specifically mentioned that Tanner's confession was unrebutted. On at least an intuitive level, this comment seems to be the most problematic—who other than Tanner could have rebutted his own confession to law enforcement? A moment's reflection, however, reveals the answer to this question. Certainly, Tanner could have taken the stand and contradicted the agents' testimony about his confession. But Tanner also could have rebutted this testimony by calling witnesses to

undermine the substance of the alleged confession, by testifying that he was not a drug dealer. Again, there is no reason to think that Tanner's girlfriend and alleged co-conspirators could not have been available to provide such testimony if there had been a factual basis for it.

In sum, we hold that the prosecutor's comments did not plainly implicate, even indirectly, Tanner's constitutional right to remain silent. Absent such error, "the inquiry is over, and there is no reason to grant a new trial." *Cheska*, 202 F.3d at 950.

III. *Evidentiary Issues*

Tanner next raises a number of objections to evidence that was admitted at his trial. In particular, Tanner claims that the district court erred by allowing evidence regarding his possession and use of firearms at a New Year's Eve party in 1999, his affiliation with a street gang known as the Renegades, and his presence at a meeting where marijuana use and legal gambling took place. We review these evidentiary matters for an abuse of discretion, unless Tanner failed to object at trial, in which case our review is for plain error. See *United States v. Alviar*, 573 F.3d 526, 541 (7th Cir. 2009).

A. *Firearm Possession*

Prior to trial, the government gave notice that it planned to offer testimony that Tanner had "possessed firearms during drug transactions" and "purchased

numerous firearms from a government witness," and "that numerous firearms were seized at [Tanner's mother's home] on December 31, 1999, and that the co-conspirators were present at the home." Tanner's co-defendant Foster moved to exclude the evidence regarding the weapons seized from Tanner's mother's home, on the grounds that it was irrelevant, unduly prejudicial, and evidence of prior bad acts. Tanner joined the motion. The district court denied the motion, reasoning that guns are admissible as drug traffickers' tools of the trade.

At trial, the prosecution offered extensive testimony from two Gary, Indiana, police officers detailing Tanner's use of firearms at a New Year's Eve party on December 31, 1999. The officers had been on patrol when they heard a large number of shots fired nearby. The officers followed the sound of gunfire to Tanner's mother's home, where they discovered that a number of partygoers had been firing guns in the air to celebrate the new year. The officers briefly detained the partygoers and confiscated numerous weapons found at the scene. They made no arrests and did not identify any of the partygoers. Cooperating witness Moore, who had attended the party, confirmed that Tanner had fired an assault rifle that night. On the basis of this testimony, the government introduced into evidence a number of guns that were seized at the New Year's party. Tanner argues that the district court erred by allowing this evidence, on the grounds that it constituted evidence of prior bad acts, was irrelevant, and was unduly prejudicial. We review this evidentiary issue for

an abuse of discretion. *E.g., United States v. Gallardo*, 497 F.3d 727, 732 (7th Cir. 2007).[2]

Upon review of the trial record, we conclude that the law enforcement officers' testimony should have been excluded under Federal Rule of Evidence 403, which requires relevant evidence to be excluded if its prejudicial impact substantially outweighs its probative value. Under the tools-of-the-trade doctrine, Tanner's possession of a firearm on a prior occasion might be relevant to the allegation that he is a drug dealer, *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000), but the specific probative value attached to that firearm will vary from circumstance to circumstance. For example, evidence that Tanner carried a concealed weapon on a regular basis during the time he allegedly dealt in illegal narcotics would have much greater probative value than evidence that he had, during the same period of time, borrowed a friend's shotgun for a hunting trip or rented a handgun for use at a firing range. In other words, context is critical when determining the probative value to assign to a defendant's possession and use of a firearm. Considered in context, the mere fact that Tanner fired a gun of unknown ownership, not during a drug deal but at a party celebrating the new year, carries extremely little if any probative value for the allegation that he was the ringleader of a multi-state conspiracy to distribute cocaine.

---

[2] Because we conclude that the error that occurred here was certainly harmless, we decline to address the parties' dispute over whether plain-error review is appropriate.

Probative value is only half of the inquiry under Rule 403 here. We must also determine the evidence's prejudicial impact—the likelihood that it will influence the jury to decide a case on improper grounds, *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995)—to see whether that prejudicial impact is substantial in relation to the evidence's probative value. See *United States v. Torres*, 977 F.2d 321, 328 (7th Cir. 1992) ("[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote.").

Like probative value, prejudice must be determined in context. Evidence that is only marginally prejudicial when presented to the jury in one manner may be greatly prejudicial when presented in another. See, *e.g.*, *id.* at 329 (finding significant to its analysis of prejudice that "no evidence beyond the essential facts . . . was adduced," without "exposing unnecessary details simply to make the defendant look bad").[3] Here, while testifying about their seizure of the weapons from the New Year's Eve party, the officers offered up a great deal of extraneous and prejudicial information. They made sure that the jury was aware that Gary police officers had been shot on previous New Year's Eves, that the officers at the party were "outmanned" and "out-gunned," and that the officers had never been to a crime scene where they found more shell casings on the ground. One officer,

---

[3] It is for this reason that trial courts often hesitate, or even outright refuse, to allow certain relevant evidence (such as firearms or autopsy photos) into the jury room.

for reasons that escape us, was even allowed to explain that his wife was so scared by the events of that night that she never again listened to her police scanner while he was on patrol.

When the officers' testimony is considered in its entirety, it is clear that its prejudicial impact significantly outweighed its infinitesimal probative value for the actual criminal case against Tanner. This testimony established exactly one arguably relevant fact—Tanner's access to a gun at a party that took place five years before his arrest—but was riddled with numerous "unnecessary details simply to make the defendant look bad." *Id.* Even under the deferential abuse-of-discretion standard, we conclude that this testimony should have been excluded.[4]

This error proved harmless, however, and did not affect the admissibility of the firearms themselves. Even without the officers' testimony regarding the New Year's Eve party, the jury would still have learned that Tanner had possessed and used firearms, often in the course of his drug dealing activities. That evidence was entirely appropriate. In addition to Moore's testimony placing Tanner at the New Year's Eve party,

---

[4] We remind prosecutors that we endorsed the "tools-of-the-trade" rationale to allow jurors limited access to relevant information about drug dealers' gun ownership or possession, not to give prosecutors *carte blanche* to regale juries with every last prejudicial and unnecessary detail of how it was learned that a particular drug dealer possessed a gun.

Moore testified that Tanner had possessed firearms during the period when he dealt drugs, that Moore had sold Tanner a firearm in exchange for a reduction in Moore's drug debts, and that "Tanner own[ed] guns because he was a drug dealer." None of Moore's testimony was admitted in error, and his testimony was sufficient to allow the introduction of the seized firearms into evidence.[5] Although the officers' testimony about the party was so unduly prejudicial (and such a waste of time) relative to its nearly-nonexistent probative value as to require its exclusion, that testimony was cumulative and was not so prejudicial relative to the extremely strong evidence of Tanner's guilt as to make us believe that its exclusion would have made an acquittal even slightly more likely.

B. *Gang Affiliation*

Substantial testimony at trial indicated that Tanner was the leader of a gang known as the Renegades. A number of Renegades were members of the alleged conspiracy, and Moore testified that they sold drugs in

---

[5] To the extent that Tanner argues that the firearms lacked sufficient foundation, we again note that no rule of evidence requires a "foundation" and that all relevant evidence is generally admissible. *Collins*, 604 F.3d at 488, quoting *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637-38 (7th Cir. 2001). When attorneys and judges refer to a lack of "foundation," they generally refer to a link missing in a chain of logic needed to show that the evidence is actually relevant.

Indianapolis, Cincinnati, and Louisville. Tanner was personally involved in the Renegades' movement of drugs to Cincinnati and Louisville. Tanner argues that this testimony was inadmissible because it was irrelevant and unduly prejudicial evidence of prior bad acts under Federal Rule of Evidence 404(b).

Tanner's argument on this point is without merit. Despite its significant prejudicial potential, evidence of Tanner's affiliation with the Renegades was relevant and admissible to show his participation in a criminal conspiracy with members of that very gang. *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997); see *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996) ("[G]ang membership can be key to establishing criminal intent or agreement to conspire."); *United States v. Thomas*, 86 F.3d 647, 652-53 (7th Cir. 1996) (holding that gang evidence helped demonstrate the existence of conspiracy and was not unfairly prejudicial, and noting that the evidence "helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy"). Furthermore, the evidence concerning Tanner's gang affiliation was not evidence of "'prior bad acts' as that term is understood," given that it was direct "evidence of the very drug distribution conspiracy with which [Tanner] was charged." See *Collins*, 604 F.3d at 488.[6]

---

[6] Tanner also insists that it was improper to refer to the Renegades as a gang because they were actually a loosely-associated group of "freelancers." While there was some testimony indicating that the Renegades were only loosely organized, there

(continued...)

C. *Marijuana Use & Legal Gambling*

At one point, Moore testified that he, Tanner, and a number of other people, had attended a meeting in a hotel room on a riverboat casino. Moore admitted that he had smoked marijuana at that meeting. Tanner argues that this testimony implicated him as a gambler and a drug user and constituted propensity evidence inadmissible under Rule 404(b). Tanner failed to object to this testimony at trial, so our review is once again only for plain error.

Given that the meeting Moore attended was held at a licensed casino, the jury could easily have assumed that any gambling was legal. On review for plain error, then, we could reverse only if we were willing to say that testimony concerning legal gambling were so plainly indicative of Tanner's propensity to violate the law that its exclusion would have probably resulted in his acquittal. See *Collins*, 604 F.3d at 487. We simply cannot say that. Many law-abiding Americans visit legal casinos each year. It seems wholly unlikely that anyone would conclude that their visits show a latent propensity to break the law.

Nor was it error to allow Moore to testify about his personal drug use on that occasion. Moore testified

---

[6] (...continued)
was also ample testimony that they were in fact a street gang that had broken off from the Gangster Disciples. Any reference to the Renegades as a "gang" was justified from the testimony and cannot be considered error.

only that he had smoked marijuana after someone at the meeting had handed him a joint. He did not indicate that Tanner had provided the marijuana or that Tanner was even aware that Moore was smoking marijuana. Contrary to Tanner's assertions in his briefs (based on a citation to an unrelated part of the trial record), Moore did not testify that Tanner himself had smoked any marijuana. Thus, any bad acts were those of witness Moore, and Moore alone. Witness Moore's acts simply cannot be considered evidence of defendant Tanner's propensity to commit crime, however. Rule 404(b) forbids the use of a person's prior bad acts only to show that same person's later action in conformity therewith.

IV. *Jury Instructions*

Tanner next argues that the district court erred when instructing the jury. He claims that the court erred by giving the jury an "ostrich" instruction, by failing to instruct the jury on the law regarding criminal conspiracies involving government informants, and by failing to give any limiting instructions regarding the evidence of Tanner's gang affiliation and Moore's drug use. We ordinarily review a district court's decision whether or not to give a particular instruction for an abuse of discretion, *United States v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998), but evaluate de novo whether an instruction was appropriate as a matter of law, *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009), quoting *United States v. Macedo*, 406 F.3d 778, 787 (7th Cir. 2005). Because Tanner presented none of these arguments to

the district court, however, our review is for plain error. *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987).[7]

A. *The "Ostrich" Instruction*

Among its instructions to the jury, the district court included an "ostrich" instruction (*i.e.*, an instruction informing the jury that it could consider Tanner's willful ignorance of any fact as his actual knowledge of that fact). Tanner failed to object to this instruction, which he now asserts was inappropriate as a matter of law because the evidence did not show his willful ignorance of any fact at issue in the trial.

Generally, a jury instruction should be given only when it addresses an issue reasonably raised by the evidence. *Wilson*, 134 F.3d at 868, quoting *United States v. Stone*, 987 F.2d 469, 471 (7th Cir. 1993). In particular, an ostrich instruction is appropriate only when "(1) a defendant claims a lack of guilty knowledge and (2) the government presents evidence that suggests that the defendant deliberately avoided the truth." *United States v. Ciesiolka*, 614 F.3d 347, 353 (7th Cir. 2010). This instruction must be given with some caution, however, lest the jury get the mistaken impression that it may convict

---

[7] Tanner's reliance on our decision in *United States v. Jackson*, 103 F.3d 561, 569 (7th Cir. 1996), for a different standard of review is misplaced, as that case only concerns when an intervening change of law has rendered improper an instruction given to the jury.

on the basis of mere negligence. *Id.*, citing *United States v. Carrillo*, 435 F.3d 767, 781 (7th Cir. 2006). For that reason, an ostrich instruction should not be given merely because a defendant's knowledge of a particular fact is necessary for a finding of guilt.

The government, which requested that the ostrich instruction be given, claims that Tanner's questioning on cross-examination made this instruction necessary. On cross-examination, defense counsel asked a law enforcement officer whether sophisticated drug dealers normally transport drugs in plain view or are more likely to conceal the drugs in containers or hidden compartments. The government asks us to construe this line of questioning as an implicit assertion that Tanner was unaware that he was supposed to be receiving drugs from Solis on the night he was arrested. Although questions on cross-examination might indicate a defense of lack of knowledge under at least some circumstances, see *United States v. Smith*, 995 F.2d 662, 674 (7th Cir. 1993), these particular questions could not reasonably be understood to assert Tanner's ignorance. And even if this line of questioning could be understood that way, the government points to no evidence in the record showing that Tanner "deliberately avoided the truth." See *Ciesiolka*, 614 F.3d at 353 (concluding that ostrich instruction was given in error where no evidence showed that defendant avoided knowledge of his victim's age). To the contrary, the government's evidence—Tanner's confession, as well as the recordings of Solis's telephone calls arranging the drug deal with Tanner—made clear that Tanner was well aware that Solis was supposed to

bring him 15 kilograms of cocaine. "[I]f the evidence against the defendant points solely to direct knowledge of the criminal venture, it would be error to give the [ostrich] instruction." *United States v. Caliendo*, 910 F.2d 429, 435 (7th Cir. 1990) (quotation omitted). Even absent any objection, the district court erred by giving an ostrich instruction here, where the government presented no evidence that Tanner deliberately attempted to avoid any guilty knowledge.[8]

Although the ostrich instruction was given in error, Tanner cannot establish that he was harmed by that error. "Our plain error review is particularly light-handed in the context of jury instructions," *United States v. Granados*, 142 F.3d 1016, 1023 (7th Cir. 1998) (quotation omitted), and it is only in a rare case that "an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court," *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Ironically, the same evidence that helped establish the impropriety of the ostrich instruction renders that instruction

[8] From the arguments in its briefs, it appears that the government felt that an ostrich instruction was necessary in regard only to Tanner's attempted acquisition of cocaine from Solis. But if Tanner had tried to learn precisely what substance Solis had offered for sale, he would have discovered that the substance was not actually illegal drugs and would not have been interested in a deal. As we have recently explained, an ostrich instruction is improper when applied to an issue where "a defendant's knowledge of the real truth would actually exonerate him." *Ciesiolka*, 614 F.3d at 352.

entirely harmless. The evidence left no room to doubt that Tanner intended to obtain a large amount of cocaine from Solis the night he was arrested. There is no reason to believe that the jury convicted Tanner on evidence showing only an innocent or negligent receipt of illegal drugs. See *Ciesiolka*, 614 F.3d at 353, citing *Carrillo*, 435 F.3d at 781.

B.  *Failure to Provide "Sears" Instruction and Limiting Instructions*

Tanner next argues that the jury should have been instructed that (1) because Moore and Solis, two of Tanner's alleged co-conspirators, acted as government agents for a time, Tanner could not have conspired with either man during that time; and (2) Moore's testimony regarding legal gambling and marijuana use, as well as the evidence of Tanner's gang affiliation, could be considered only for the purposes allowed under Rule 404(b). Tanner failed to request any such instructions at trial, so we would reverse only if the failure to give the instructions resulted in a miscarriage of justice. *United States v. Clark*, 989 F.2d 1490, 1500 (7th Cir. 1993); see *United States v. Bermudez*, 526 F.2d 89, 97 (2d Cir. 1975) ("Failure to give limiting instructions is generally held not to be plain error.").

Tanner's first assignment of error concerns the district court's failure to give what is generally known as a *Sears* instruction, after the Fifth Circuit's decision in *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965). Such an in-

struction informs the jury that a defendant's agreement with a government agent cannot support a charge of criminal conspiracy. See, *e.g.*, *United States v. Duff*, 76 F.3d 122, 127 (7th Cir. 1996). The instruction is appropriate whenever a jury might find a conspiracy between a defendant and a government agent, however short the period of time in which the agent worked for the government. See *United States v. Eberhart*, 467 F.3d 659, 666 (7th Cir. 2006). Solis and Moore, both of whom had served as government informants for a time, were two of the government's key trial witnesses. The indictment specifically named both men as Tanner's co-conspirators, though, potentially allowing the jury to believe that it could convict Tanner of conspiracy if either man had conspired with Tanner at any time. Theoretically, then, it was possible for the jury to convict Tanner erroneously for conspiring with either Moore or Solis while they were government informants. For this reason, if Tanner had requested a *Sears* instruction, it would likely have been error for the district court to refuse that instruction. See *Duff*, 76 F.3d at 127 (holding that a *Sears* instruction is appropriate when the terms of an indictment allow a jury to convict solely on a finding of a conspiracy with a government agent).

Tanner did not request a *Sears* instruction, however, and we see no reason to believe that a *Sears* instruction was plainly necessary here. Tanner would have benefitted from such an instruction only if the jury was likely to conclude both (1) that Tanner conspired only with Moore and/or Solis; and (2) that Tanner did so only during the time when each man was a government

informant. Moore and Solis were government agents for only very short times, however. Moore acted as an informant for just a few months before Tanner was arrested. Solis was an informant for all of one day. On the other hand, the jury heard a great deal of evidence indicating that Tanner, over the course of several years, conspired with his brothers and the Renegades who acted as his drug couriers. It is highly unlikely that the jury concluded from this evidence that Tanner conspired only with Solis and Moore for a short time. While it is theoretically possible that the jury found that Tanner conspired with only Moore and/or Solis, and only while those men acted as government informants, such a remote possibility of harm is not enough to have rendered a *Sears* instruction plainly necessary.

Regarding the absence of Rule 404(b) limiting instructions, as we explained above, neither the gang evidence nor the evidence of witness Moore's drug use was evidence of prior bad acts governed by Rule 404(b). The district court would have erred if it had instructed the jury otherwise. As for the testimony concerning legal gambling, the absence of a limiting instruction was undoubtedly harmless—a failure to instruct the jury not to draw a negative inference that it was extremely unlikely to draw anyway simply cannot be deemed harmful on plain-error review.

## V. *Sentencing Issues*

At sentencing, the district court calculated Tanner's advisory guideline range to be life imprisonment and,

after considering the parties' arguments, sentenced Tanner to life in prison. Tanner now claims that this sentence resulted from procedural errors in calculating the advisory sentencing guideline range and is substantively unreasonable. On review of a district court's sentencing decisions, we first review the record for any procedural errors, such as a reliance on clearly erroneous facts. *United States v. Larsen*, 615 F.3d 780, 789 (7th Cir. 2010), quoting *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008). If we are satisfied that no procedural error occurred, we review the sentence's substantive reasonableness for an abuse of discretion. *E.g.*, *United States v. Knox*, 573 F.3d 441, 446 (7th Cir. 2009).

A. *Procedural Error?*

In calculating Tanner's advisory guideline sentence range, the district court first concluded that Tanner had conspired to distribute more than 150 kilograms of cocaine, resulting in a base offense level of 38 under U.S.S.G. § 2D1.1. See *United States v. Zehm*, 217 F.3d 506, 511 (7th Cir. 2000) ("The [now-advisory] Sentencing Guidelines instruct that a defendant's base offense level reflect the quantity of drugs for which the defendant is accountable."). The court then added two levels under U.S.S.G. § 2D1.1(b)(1), which calls for an enhancement if a defendant or his co-conspirators possessed a firearm during the course of a drug offense. *United States v. Martin*, 618 F.3d 705, 737-38 (7th Cir. 2010). The court added four levels under § 3B1.1, which allows for an enhancement of up to four levels if a defendant acted,

directly or indirectly, as an organizer, leader, manager, or supervisor of even a single other participant in the criminal activity. See *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005); U.S.S.G. § 3B1.1, comment n.2. Tanner now asserts that the evidence did not support the firearm enhancement, the leadership enhancement, or the district court's calculation of the amount of drugs.

Unlike facts necessary for finding guilt at trial, facts used for sentencing purposes need not be proven beyond a reasonable doubt. A finding at sentencing regarding the amount of drugs for which a defendant is responsible need be supported only by a preponderance of the evidence. *United States. v. Johnson*, 342 F.3d 731, 734 (7th Cir. 2003). The same holds true for facts supporting enhancements under sections 2D1.1(b)(1) and 3B1.1. *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007); *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001). We review a sentencing court's findings of fact for clear error, and we will reverse only if we have a firm and definite conviction that an error has been made. *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008), quoting *United States v. James*, 113 F.3d 721, 730 (7th Cir. 1997).

We find no clear error in any of the challenged factual findings. Significant evidence at trial indicated that Tanner was a high-level drug dealer who "didn't want to deal with small quantities" of cocaine. In addition to a number of relatively small cocaine deals, Tanner claimed to have purchased 100 kilograms of cocaine from Illinois suppliers on one occasion. Tanner had even bragged

about receiving as much as 50 kilograms of cocaine *per week* between 2000 and 2004. Even if these amounts are discounted significantly for exaggeration, they still easily add up to much more than the 150 kilograms necessary to support the district court's factual finding.

The facts are also sufficient to support both the leadership and firearms enhancements. Regarding the leadership enhancement, Moore testified that Tanner had assumed leadership of the Renegades from his brother Lamont some time around 2000 or 2001. He also testified that Tanner employed drivers to deliver cocaine to Cincinnati. Solis gave additional testimony indicating that Tanner was a leader in the Renegades and that "everybody responded to [the Tanner brothers'] demands." As for the firearms enhancement, witnesses (other than the law enforcement officers whose testimony about the New Year's Eve party we found inadmissible) testified to seeing Tanner with a handgun and an assault rifle during the time he was selling drugs. Moore testified that he had sold Tanner an assault rifle, for which Tanner paid by giving Moore a credit toward his drug debts. Moore also sold Tanner a number of handguns. Solis testified that Tanner had "multiple assault rifles stashed in one of his places." The evidence also showed that Tanner's co-conspirators possessed firearms during the course of the drug conspiracy—a fact that, on its own, is enough to support the firearm enhancement. See *Martin*, 618 F.3d at 737-38.

B.  *Reasonableness of the Life Sentence*

Finally, Tanner argues that his sentence of life imprisonment is substantively unreasonable. The advisory guideline sentencing "range" here was life imprisonment, effectively rendering any prison sentence presumptively reasonable on appeal by the defendant. See *Rita v. United States*, 551 U.S. 338, 347 (2007) (concluding that a "court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines"); *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009) (below-guideline sentence presumed reasonable on appeal by defendant); *United States v. Trice*, 484 F.3d 470, 474 (7th Cir. 2007) (within-guideline sentence presumed reasonable on appeal). This presumption may be overcome only if Tanner demonstrates the sentence's unreasonableness in light of the sentencing factors found in 18 U.S.C. § 3553(a). *United States v. Juarez*, 454 F.3d 717, 721 (7th Cir. 2006), citing *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005).

Tanner has failed to meet this burden. He gives a number of reasons—his lack of prior convictions, his youth, his young son, and his prowess as a boxer—that he believes make life imprisonment unreasonable, but none of these reasons is sufficient to make this the "rare case" in which a guidelines sentence is inappropriate. See *United States v. Hall*, 608 F.3d 340, 347 (7th Cir. 2010). Although Tanner had no prior convictions, the advisory guidelines took that lack of criminal history into account and nevertheless deemed a life sentence appropriate, given the high total offense level resulting

from the scope of Tanner's crime and his role in it. The guidelines are presumed reasonable on appeal, *Rita*, 551 U.S. at 347, and it would be odd if that presumption might be undermined merely by reference to one of the two factors (offense level and, here, the defendant's criminal history) that the guidelines take into account in every case.

Tanner's emphasis on his "youth" is simply misleading. He is not a child or even a teenager, but an adult able to understand the consequences of his actions. Although the indictment charged that the conspiracy began when Tanner was a teenager, Tanner's criminal conduct occurred largely, if not entirely, during his adulthood. As for Tanner's prowess as a boxer, the district court had no obligation to impose a lower sentence just so Tanner might pursue the boxing career he had already eschewed for a more lucrative life of crime. (We assume a *much* lower sentence would have been needed to allow Tanner to box outside prison while he is still young and healthy enough.) We sympathize with Tanner's young son, who undoubtedly deserved a better chance to have a father play a meaningful role in his life. But the district court reasonably concluded that Tanner's decision to pursue a life of crime showed his apparent disregard for his son's welfare, as well as for the welfare of those who were harmed by the cocaine Tanner helped distribute, and justified adherence to the guideline recommendation of life imprisonment.

AFFIRMED.